**Dalton HAWKINS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 82–492.

District of Columbia Court of Appeals.

Argued March 17, 1983.
Decided May 18, 1983.

Scott Howe, Public Defender Service, Washington, D.C., with whom Franklin Burgess, Jr., Public Defender Service, Washington, D.C., was on briefs, for appellant. William J. Mertens, Public Defender Service, and W. Gary Kohlman, Public Defender Service, Washington, D.C., also entered appearances for appellant.

Mary A. McLaughlin, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty. and Michael W. Farrell, John R. Fisher, F. Joseph Warin, and William D. Nussbaum, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEWMAN,* Chief Judge, and KERN and FERREN, Associate Judges.

KERN, Associate Judge:

On July 28, 1978, appellant, a taxicab driver, shot and killed another motorist following a traffic dispute. Appellant was convicted after a jury trial[1] of second degree murder while armed, D.C.Code §§ 22–2403, –3202 (1981), and carrying a pistol without a license, id., § 22–3204. At trial, appellant admitted that he shot the decedent, but contended that he had done so in self-defense.

Appellant now seeks reversal of his convictions because of the trial court's failure to suppress statements he made to the police after his arrest. He maintains that those statements (telling the police that he

---

* Chief Judge NEWMAN concurs in the results only.

1. Shortly after these proceedings first began, it became evident that appellant suffered from a psychiatric disorder; and appellant was treated at St. Elizabeth's Hospital until he was competent to stand trial. The jury trial which resulted in these convictions was held in November 1981. Two earlier trials, held in October 1980 and October 1981, had ended in mistrials—the first because appellant suffered a mental breakdown during the course of trial, and the second because the jury was unable to reach a unanimous verdict as to the murder charge. (That second jury had rendered a guilty verdict on the charge of carrying a pistol without a license; however, the court resubmitted that issue to the jury at the third trial.)

acted in self-defense) were obtained in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. He also asserts error in certain of the trial court's evidentiary rulings and instructions to the jury. Finding no error, we affirm the convictions.

## I.

A hearing was initially held on appellant's motion to suppress in October 1980. See footnote 1, *supra*. At that hearing, the circumstances under which the challenged statements were given were explained as follows.

Appellant was arrested at his home at about 3:30 p.m. the day after the shooting and was immediately advised of his *Miranda*[2] rights from a standard PD 47 "rights card." (Supp. Record I at 71–72.) He orally acknowledged that he understood his rights. He was then searched, handcuffed, and transported to the homicide office; there was no conversation en route. (Supp. Record I at 73–74.) Upon his arrival at the homicide office, appellant was seated in an interview room and again was advised of his *Miranda* rights. (Supp. Record I at 76.) Appellant stated that he did not wish to talk and, after reading a PD 47 card, responded in the negative to the last two questions on the back of the card.[3] It was 3:55 p.m. when appellant signed the card. (Supp.Record I at 78.)

The two homicide detectives who were with appellant then left the interview room. One of them asked Sergeant Robert Sharkey, who was in charge of the homicide office at the time, to "process" appellant, *viz.*, to prepare the necessary police forms. (Supp. Record I at 92.) He informed Sharkey that appellant had said he did not wish

to answer any questions; and he asked Sharkey to "tell [appellant] the facts of the case." (Supp. Record I at 93, 125.)

Sergeant Sharkey then familiarized himself briefly with the case and, at approximately 4:05 p.m., moved appellant to another interview room, introduced himself to appellant, and told appellant he was going to "process" him. (Supp. Record I at 94–95, 135–36.) At that point, Sergeant Sharkey also told appellant that "he was here on a charge of homicide in reference to a shooting that had occurred on the prior date at 9:30 p.m., and that an investigation revealed that he was responsible." (Supp. Record I at 96.) Sharkey then began to type one of the police reports.

Within just minutes, at approximately 4:15 p.m., appellant stated that "he had been thinking it over and he decided that he wanted to get it off his chest." (Supp. Record I at 97–99.) Appellant was then advised of his *Miranda* rights a third time; and he signed a waiver of his rights on another PD 47 card. He then gave Sergeant Sharkey his version of the events leading up to the shooting, and Sergeant Sharkey asked him some clarifying questions. (Supp. Record I at 101–02.) At approximately 4:30 p.m. appellant was again readvised of his *Miranda* rights and was asked why he had changed his mind and decided to give a statement. According to Sergeant Sharkey, appellant replied: "I had a few minutes to think it over, and because I have never been in this type of situation, I did not know what to do or say. But after thinking it over, I want to tell the truth. I felt that the man was going to kill me. He said that he was. And that is why I shot him." (Supp. Record I at 107, 111.)

---

**2.** In *Miranda v. Arizona* (hereinafter *"Miranda"*), *supra*, the Court held that the prosecution may not use statements, incriminatory or exculpatory, stemming from custodial interrogation unless the accused has been fully advised of the now familiar *"Miranda"* rights—to remain silent (and that any statement he makes may be used against him), to have the assistance of an attorney, to cut off questioning at

any time—and has voluntarily, knowingly, and intelligently waived those rights.

**3.** The questions to which appellant answered "no" were: "Are you willing to answer questions?" and "Are you willing to answer questions without an attorney present?"

The trial court considered the evidence adduced at the suppression hearing, and the arguments of counsel, in light of *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), and ruled that:

> [T]he Government has met its burden in that regard. I am satisfied that the police procedure from all the evidence that I have heard was fair and that . . . it was nothing the police did that would cause [appellant] to make those statements.

(Record at 167.) The court also ruled that, despite appellant's recurring psychiatric problems,

> the Court believes that the evidence does show that the waiver was voluntary and I am satisfied that [appellant] was competent to make a voluntary waiver of his rights. . . . The motion to suppress is denied.

(Record at 168.) Before the trial which finally resulted in the convictions now on appeal, a second trial judge denied a motion for reconsideration in light of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), noting that the trial court had found no new police interrogation of appellant once he asserted his *Miranda* rights and no "procurement" of appellant's statement by the police. (Supp. Record IV at 28–29.)

On appeal it is argued that Sergeant Sharkey's statement to appellant—that "an investigation revealed that he was responsible" for shooting the decedent—constitutes interrogation within the meaning of *Rhode Island v. Innis, supra.* Since his *Miranda* rights had previously been asserted, appellant argues, and since the police thereafter initiated further conversation with him which amounted to an interrogation of him,

*viz.,* telling him that an investigation showed his responsibility for the killing, his subsequent statements were *per se* inadmissible under *Edwards v. Arizona, supra.* Alternatively, he contends that the police did not "scrupulously honor" his assertion of his right to remain silent in accordance with *Michigan v. Mosley, supra,* and that, because of his mental illness, he did not knowingly and intelligently waive his *Miranda* rights even if, as the trial court found, his waiver was voluntary and he was competent to make it.

### II.

The record in this case amply supports the trial judge's conclusions that appellant's *Miranda* rights were "scrupulously honored" and that his statements to the police were not the product of an interrogation by Sergeant Sharkey,[4] but were made spontaneously and voluntarily and were preceded by a fully effective waiver of appellant's rights.

We are concerned in this case with a "second level" of *Miranda* rights: those which attach where, as here, a suspect has asserted his right to remain silent and/or his right to consult an attorney. *See United States v. Alexander,* 428 A.2d 42, 47–48, *reh. den.,* 441 A.2d 936 (D.C.1981); *Calaway v. United States,* 408 A.2d 1220 (D.C.1979); *Jackson v. United States,* 404 A.2d 911 (D.C. 1979).

The Court in *Miranda* stated that "interrogation must cease" when the person in custody indicates that "he wishes to remain silent," and that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 473–74, 86 S.Ct. at 1627–28. The Court also stated that "any statement taken after the person invokes

---

4. Appellant maintains that, following the initial suppression hearing, the trial court made no specific finding that Sergeant Sharkey's remark to appellant did not constitute interrogation. However, we are of the opinion that the judge's finding that "nothing the police did . . . cause[d appellant] to make those statements" may be read fairly to encompass a finding of no inter-

rogation. The second trial judge, in denying reconsideration, apparently took the same view of that finding. (Supp. Record IV at 28–29.) It is also worthy of note that, during the course of the suppression hearing, in response to a reference to *Rhode Island v. Innis,* the trial court indicated its view that appellant's change of mind was spontaneous. (Record at 140.)

his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474, 86 S.Ct. at 1628.

However, in *Michigan v. Mosley, supra,* the Court explained that the language in *Miranda* quoted above does not impose a *per se* prohibition upon all police questioning of a suspect in custody, or the taking of a voluntary statement, after the right to remain silent has been invoked. The Court concluded that the test for admissibility of statements obtained after an individual has asserted the right is "whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley, supra,* 423 U.S. at 104, 96 S.Ct. at 326, quoting from *Miranda, supra,* 384 U.S. at 474, 479, 86 S.Ct. at 1627, 1630. We have applied the same standard to determine the admissibility of statements obtained after the right to counsel has been asserted. *E.g., United States v. Alexander, supra,* 428 A.2d at 49; *Peoples v. United States,* 395 A.2d 41 (D.C.), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1978).

The context in which *Miranda* rights attach is that of custodial interrogation. Appellant relies heavily upon *United States v. Alexander, supra,* in his argument that Sergeant Sharkey's remarks to appellant in the instant case constituted custodial interrogation. In *Alexander,* immediately after an individual in custody had asserted her *Miranda* right to counsel, the interviewing detective followed up with the statement "we know what happened" or "we know you are responsible for the stabbing." *Id.* at 51. We held in *Alexander* that the officer had continued to interrogate the suspect after assertion of her rights and that her rights were therefore not "scrupulously honored."

The interviewing officer in *Alexander* had conceded at a suppression hearing that his statement was "a technique" he used to try to get the suspect to talk. In *Alexander* we stated that we viewed the officer's admission as "conclusively demonstrating" that the suspect's rights were not respected. However, in the instant case, Sergeant Sharkey testified at the suppression hearing

that his only purpose in making a similar statement to appellant was administrative: he was required to inform appellant of the nature of the charges against him. (Supp. Record I at 131–32.) He stated further that "I didn't have it in my mind that anything was going to be said, so it sort of caught me off guard." (Supp. Record I at 98.) He also indicated that he did not view the request made of him to tell appellant the "facts of the case" as a suggestion that he might succeed in getting appellant to talk, although the other officers had failed. (Supp. Record I at 127.)

Other factors distinguish *Alexander* from the instant case. At the outset, we note that the language used by Sergeant Sharkey—"an investigation revealed"—might well be viewed as less threatening than the statement "we know" used by the officer in *Alexander.* In *Alexander* the same officer who heard the suspect's assertion of her *Miranda* rights immediately thereafter uttered the statement calculated to make her talk. In the case before us, a different officer made the statement argued by appellant to constitute interrogation at least ten minutes after the assertion of *Miranda* rights. Most importantly, in *Alexander* the suspect was not readvised of her *Miranda* rights following the detective's statement and before she began to relate her story; fresh *Miranda* warnings were not given until she had already talked and was later asked to give a written statement.

In the instant case, appellant was readvised of his *Miranda* rights as soon as he offered to discuss the shooting and before he had recounted any of his version of the events. He was again given fresh *Miranda* warnings before his written statement was taken. Moreover, in *Alexander* the interviewing detective never inquired specially as to why the suspect had decided to talk. In the instant case, although the inquiry was not made before appellant told his story to Sergeant Sharkey, the question *was* asked before the written statement was taken, and appellant's response was made available to the trial judge at the suppres-

sion hearing. Finally, in *Alexander,* the suspect had, shortly before the interrogation, stabbed her lover; and there was evidence that she was somewhat distraught. In the instant case, the shooting occurred nearly a full day before appellant was arrested, the decedent was a stranger to appellant, and the evidence at the suppression hearing suggested that appellant, although slightly nervous, generally appeared calm.[5]

Because of the many differences between *Alexander* and the case before us, we do not view *Alexander* as dispositive. Accordingly, we turn for guidance to *Rhode Island v. Innis, supra,* where the Court, in holding that "interrogation" under *Miranda* is not limited to express questioning, defined interrogation as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1689.

Appellant maintains (Brief at 18–19) that changing interviewing officers and "positing guilt as a fact" are both well-established techniques for persuading an individual in custody to talk; and that, as a matter of law, Sergeant Sharkey "should have known" that his comment would likely

evoke a statement from appellant. In *Innis* the Court stated that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." 446 U.S. at 302 n. 7, 100 S.Ct. at 1690 n. 7.

However, the indications in the record as to Sergeant Sharkey's intent in speaking to appellant are to the contrary.[6] Moreover, while the Court in *Innis* recognized that the police purpose is one factor which "may well have a bearing" on whether a particular statement constitutes interrogation, 446 U.S. 301–02 n. 7, 100 S.Ct. at 1689–90 n. 7,[7] even if the trial court *had* concluded that Sharkey's remark was intentionally evocative, our analysis would not be at an end. The Court in *Innis* emphasized tht the test of interrogation is two-fold. *Id.* at 301–02, 100 S.Ct. at 1689–90. We must (a) make an objective evaluation of the normally foreseeable effect of the remark, "that an investigation revealed that [appellant] was responsible," (b) considering any peculiar susceptibilities of appellant then known to the police.[8]

---

**5.** Appellant was quiet; he was not crying. (Supp. Record I at 95.) Appellant was "calm" and spoke quietly as he waived his rights prior to giving the written statement. (Supp. Record I at 110.)

**6.** Although the trial court's findings did not specifically address this issue, we are mindful that the trial court had an opportunity to judge the credibility of the police witness in reaching his conclusion that appellant's statement was not the product of forbidden interrogation. Thus, we view this element of the trial court's decision on the motion to suppress as a finding since it is supported by substantial evidence. D.C.Code § 17–305(a) (1981). We may not assume, contrary to the evidence at the suppression hearing, that Sergeant Sharkey intended to evoke an incriminating response by his statement to appellant. *E.g., Robertson v. United States,* 429 A.2d 192, 195 (D.C.1981); *cf., Howard v. United States,* 452 A.2d 966 (D.C.1982).

**7.** Specifically, the Court in *Innis* stated:
This is not to say that the intent of the police is irrelevant, for it may well have a bearing

on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.
*Id.* at 301–02, 100 S.Ct. at 1690.

**8.** One scholarly article notes that the "reasonably likely" test of *Innis* is subject to several quite different interpretations and suggests that the preferable inquiry is, much as we have phrased it, whether an "objective observer (with the same knowledge of the suspect as the police officer) would, on the sole basis of hearing the officer's remarks, infer that the remarks were designed to elicit an incriminating response . . . ." White, *Interrogation Without Questions,* 78 Mich.L.Rev. 1209, 1232 (1980). Indeed, in *Innis* the Supreme Court itself made a *de novo* finding that the police conversation (in that case in their vehicle, while the accused was present) did *not* amount to interrogation.

■ Applying this two-part test to the case at hand, we conclude that Sergeant Sharkey's remark to appellant did not constitute interrogation. In addition to the factors which we noted distinguished this case from *Alexander,* the trial court heard testimony from one of the arresting officers that appellant was coherent and articulate, and that appellant exhibited none of the characteristics he had observed in his prior experiences with persons who were suffering psychiatric disorders. (Supp. Record I at 74–75.) Sergeant Sharkey testified that appellant was quiet and coherent, displayed no irregular emotional behavior, asked no unusual questions, and answered his questions in a responsive manner. (Supp. Record I at 95, 97, 114–15.) He testified further that, at the time he made the statement, he was unaware that appellant had been treated for psychiatric disorders and was unaware that appellant had never before been arrested. (Supp. Record I at 114, 137–38.) Another officer, who had witnessed appellant's signing of the waiver of his rights, testified that appellant at that time still appeared calm, was not crying, and still exhibited no abnormal behavior. (Supp. Record I at 53.)

In sum, the possibility of appellant's being peculiarly susceptible to Sergeant Sharkey's remark because of his mental illness apparently was not then known to the police officers; and in view of Sharkey's testimony as to his purpose in making the statement, and the fact that his statement, as worded, was consistent with his stated purpose (or at least of an equivocal nature), the remark properly may not be considered interrogation.

■ For these same reasons, and for the following additional reasons, we also agree with the trial court that appellant's asserted *Miranda* rights were "scrupulously honored." Appellant was advised of his *Miranda* rights four different times over a period of approximately one hour, including fresh warnings before he gave a written statement. He orally acknowledged that he understood his rights, and when he asserted them, no attempt was made by the police thereafter to renew interrogation (or even to listen to his story) until, after a break of some ten minutes, he volunteered to talk, and then executed a waiver of his rights.

### III.

We turn now to appellant's contention that the record does not support a finding that he knowingly and intelligently waived his previously asserted *Miranda* rights.

Appellant posits that *Edwards v. Arizona, supra,* must be read as establishing a bright-line rule that the *Miranda* right to counsel, once asserted, may never be waived under circumstances where the police, rather than the individual in custody, reinitiate the interrogation.[9] Such a broad reading of *Edwards* is questionable. 451 U.S. at 488–92, 101 S.Ct. at 1886–88 (Powell, J., concurring). Moreover, even were we to accept appellant's view, *Edwards* would not preclude a waiver in this case. Appellant's first statement, that he "wanted to get it off his chest," was entirely voluntary, there being no interrogation of him which might have prompted it. The subsequent questioning by the police of appellant which did occur (after he made the statement asserting that he was willing to talk) had been

---

9. At oral argument, appellant's counsel elaborated on this theme, suggesting that *Edwards* may be read to require the *per se* exclusion of any statements obtained through police-initiated conversation with a suspect who has asked for, but not yet received, counsel, without regard to whether the police contact constituted interrogation. However, the Court in *Edwards* stated: "Absent such interrogation, there would have been no infringement of the right that [appellant] invoked and there would be no occasion to determine whether there had been

a valid waiver." 451 U.S. at 486, 101 S.Ct. at 1885. Moreover, *Edwards* involved a clear case of renewed police interrogation subsequent to the assertion of the right to counsel. *Edwards* might just as well be read more narrowly, as simply restating "familiar principles of waiver," but emphasizing that the consideration as to who initiated the discussion is an important factor in determining the validity of a "second-level" waiver of the right to counsel. *Id.* at 488–92, 101 S.Ct. at 1886–88 (Powell, J., concurring).

initiated by appellant, not by the police. We must analyze that subsequent interrogation in light of *Edwards,* which makes it clear that the right to have counsel present, once asserted, may be waived where the individual in custody has initiated the dialogue with police. *Edwards v. Arizona, supra,* 451 U.S. at 486, n. 9, 101 S.Ct. at 1885, n. 9; *see Wyrick v. Fields,* —— U.S. ——, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).[10]

█ Our task in this case, then, is to consider whether appellant's waiver was knowing and intelligent "under the totality of the circumstances," including the fact that appellant reopened the discussion with Sergeant Sharkey. *Edwards v. Arizona, supra,* 451 U.S. at 486, n. 9, 101 S.Ct. at 1885, n. 9. As with the waiver of any constitutional privilege, we must consider "the particular facts and circumstances surrounding [the] case, including [appellant's] . . . background, experience, and conduct." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979); *see Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979). The trial court's decision as to the validity of the waiver will not be overturned if it is supported by substantial evidence. *Bliss v. United States,* 445 A.2d 625, 631 (D.C.1982); *Wilkerson v. United States,* 432 A.2d 730, 734 (D.C.), *cert. denied,* 454 U.S. 1090, 102 S.Ct. 654, 70 L.Ed.2d 628 (1981).

█ Appellant was inexperienced as a criminal defendant and had asserted his *Miranda* rights only a quarter hour before he decided to talk. However, the circumstances under which appellant executed the waiver did not constitute interrogation; and he was advised of his *Miranda* rights on four occasions. There is no evidence in the record that he was coerced, tricked, intimidated, or treated other than with respect. Although he had a history of treatment for mental illness, his conduct at the time of

the waiver, according to the evidence in the record, did not so indicate.

Most importantly, the testimony heard at the suppression hearing concerning appellant's probable mental state at the time of the waiver was, at most, conflicting. A clinical psychologist, who had diagnosed appellant as a paranoid schizophrenic suffering from delusions of persecution, suggested that appellant would have been more susceptible than the normal person to perceived threats in the interview situation. (Record at 82, 84–85.) He also indicated that appellant might behave entirely normally and apparently rationally even while psychotic. (Record at 87, 97–98, 130.) However, with respect to appellant's specific decision to waive his *Miranda* rights, he stated: "The only opinion I can offer is that it *could be* related to his mental illness." (Record at 131, emphasis added.)

By contrast, a psychiatrist testified that, in his opinion, appellant "had been mentally ill from time to time, but at that particular time his mental illness was in a state of remission." (Supp. Record I at 23.) He further testified that appellant's statement given to the police was "coherent," and that, on the date of the waiver, appellant "had the mental capacity to understand what the police officers were telling him and had the mental capacity to remain silent or to cooperate." (Supp. Record I at 23, 28.) The psychiatrist's testimony was supported by that of a Superior Court employee who had prepared the recommendation with respect to appellant's release pretrial. She testified that she normally would recommend a forensic psychiatric examination for persons who displayed any abnormal behavior, but that she did not do so in this case. She also stated that she would have reported any psychiatric problems appellant mentioned to her in her interview with him, but that she reported none in this case. (Record at 65, 69–70.)

---

10. *Cf., United States v. Hinckley,* 217 U.S.App. D.C. 262, 672 F.2d 115 (1982) (statements suppressed where police continued to interrogate

suspect in the face of his assertion of right to counsel, and suspect did not initiate further communication).

Recognizing that it is the trial court's province to balance the conflicting testimony, we conclude that the evidence in the record on appeal does support the trial judge's finding that appellant was competent to make a voluntary waiver of his *Miranda* rights.

IV.

Appellant also asserts error in the trial court's exclusion of certain evidence of the decedent's violent character. Appellant proffered testimony at trial that, over a period of two years ending nearly three years before the shooting, the decedent had seriously assaulted his wife on numerous occasions and had purposefully inflicted injury upon himself when his wife, once threatened to leave him.

Appellant points to the fact that the government presented evidence at trial, and the prosecutor argued, that appellant had initially provoked the attack upon him by the decedent. Appellant also points to the fact that the trial judge gave instructions to the jury which permitted the jury to find that appellant was, indeed, the aggressor, and was therefore not entitled to the defense of self-defense. (Record at 1338.) Accordingly, he argues, the objective question as to who was the aggressor clearly was an issue before the jury at trial; and he was entitled to present evidence of the victim's violent character to support his claim of self-defense. *Johns v. United States,* 434 A.2d 463, 468–69 (D.C.1981); *United States v. Akers,* 374 A.2d 874, 877 (D.C.1977).

The issue as to whether appellant may have been the aggressor, at *least* at the time of the shooting,[11] was before the jury; and appellant's proffered evidence was therefore arguably admissible. However, "a trial judge is entrusted with broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Johnson v. United States,* 452 A.2d 959, 960 (D.C.1982). The trial court must determine whether the evidence is relevant to a material issue and may exclude the proffered evidence if its probative value is outweighed by the danger of undue prejudice. *Id.,* 452 A.2d at 960; *Wooten v. United States,* 285 A.2d 308, 309 (D.C.1971).

██ In this case, the proffered evidence had scant probative value because it was remote in time, because of the decedent's apparently peaceable character in the interim three years,[12] and because the proffered evidence concerned instances of the decedent's violent behavior in the special context of the marital relationship. Moreover, the evidence, if introduced, might have confused the issues or unduly prejudiced the jury.[13] Accordingly, we are of the opinion that the trial judge did not abuse his discretion in refusing to admit the proffered character testimony into evidence.

Appellant's final contention is that the trial court erred in refusing to permit cross-examination of the government's key witness concerning a prior accident claim she had filed against another taxicab driver.

11. The trial court limited the jury's consideration of this issue to the time of the incident. (Record at 1334–36.) Because this issue *was* before the jury, appellant's secondary contention, that the trial court's instructions to the jury were erroneous, is insubstantial. We do not view the trial court's remarks, cited by appellant, to the effect that the decedent was unquestionably the aggressor, as more than an indication of his view that the probative value of the proffered evidence was marginal, since the issue was not a close one.

12. The trial court did not exclude the evidence only because, as appellant argues, he believed

there was no issue as to who was the aggressor. In fact, the trial judge expressly analyzed the evidentiary question in terms of the remoteness of the proffered evidence and the lack of a showing of some continuing relationship between the prior acts and the decedent's character at the time of the incident. (Supp. Record IV at 227–28).

13. As the trial judge stated it, the evidence would have tended to "invite a disposition based upon [a] good guy/bad guy comparison rather than the validity of the self-defense defense." (Record at 928.)

The scope of cross-examination generally is committed to the trial judge's discretion, *e.g., Holt v. United States,* 381 A.2d 1388, 1390 (D.C.1978); and the court in its discretion may restrict questioning about matters with little relevance or probative value. *Brown v. United States,* 409 A.2d 1093, 1099 (D.C.1979); *Mitchell v. United States,* 408 A.2d 1213, 1214 (D.C.1979).

 Appellant hoped in this case to impeach the witness' testimony by showing that, because of her earlier involvement in an accident with a taxicab driver, she had developed a specific bias against taxicab drivers; and by showing that she had a motive for remembering appellant apart from the events of the day in question—in case she were to file a claim against him for any reason in the future. The trial court precluded the inquiry because the evidence was "too collateral" and because its probative value, "to the extent it had any probative value at all," would relate only to the witness' general character. (Supp. Record IV at 108, Record at 1030.) In view of the collateral nature of the evidence, and the tenuous theory on which counsel sought to introduce it, we conclude that the trial court did not abuse its discretion in curtailing the cross-examination.

Accordingly, there being no reversible error in any alleged respect, the judgment must be and hereby is

*Affirmed.*