# District of Columbia
# Court of Appeals

No. 14-CF-1326

DAVID A. SHEPHERD,

<div style="text-align:center">Appellant,</div>



FILED

AUG – 4 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

<div style="text-align:center">CF1-9602-12</div>

UNITED STATES,

<div style="text-align:center">Appellee.</div>

<div style="text-align:center">

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  FISHER and THOMPSON, *Associate Judges*; and PRYOR, *Senior Judge*.

**J U D G M E N T**
</div>

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the matter on appeal is affirmed.

.

<div style="margin-left:40%">

For the Court:

JULIO A. CASTILLO
Clerk of the Court
</div>

Dated:  August 4, 2016.

Opinion by Associate Judge John R. Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-1326

DAVID A. SHEPHERD, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 8/4/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF1-9602-12)

(Hon. Russell F. Canan, Trial Judge)

(Argued April 13, 2016                      Decided August 4, 2016)

*Joshua Deahl*, Public Defender Service, with whom *James Klein* and *Jonathan Anderson*, Public Defender Service, were on the brief, for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman* and *Suzanne Grealy Curt*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and PRYOR, *Senior Judge*.

FISHER, *Associate Judge*: Appellant David Shepherd appeals his convictions related to the shooting death of Henry Miller. He contends that the trial court erred by excluding details of Miller's past assault on an ex-girlfriend. Appellant also argues that the trial court erred by leaving the record uncorrected after the

government mischaracterized the evidence in rebuttal argument. We hold that the trial court did not abuse its discretion with respect to the prior act of violence and, although the prosecutor misstated certain evidence, the misstatements did not substantially prejudice appellant. Accordingly, we affirm.

## I. Background

On June 2, 2012, appellant David Shepherd agreed to help his coworker James Ingram and Ingram's wife, Jayda Ingram, move. James and appellant worked together at Bowie Lawn Service, and, from 10 a.m. to 10 p.m., they used two of the company's white work trucks to move the Ingrams' possessions. During that time, appellant spoke to Jayda about some personal issues he was having with his wife. After appellant and the Ingrams parted ways, James and Jayda picked up James's first cousin, Henry Charles Miller ("Chuck" or "Miller"), from his home in southeast D.C. They drove to a liquor store where they purchased some vodka and then drove to 1128 Chicago Street, S.E. – arriving around 11 p.m. – after James received a call from one of his tenants there.

When Jayda pulled up to 1128 Chicago Street, the white work truck that appellant had been driving earlier in the day was parked out front. After helping

the Ingrams, appellant had gone to the house to socialize with some of the tenants with whom he was friends. During that time, appellant also called his wife, "got a little agitated," said "something like 'I should kill her,'" and then later said "I keep it with me." The tenant who heard these statements did not remember how much time separated "I should kill her" from "I keep it with me" and did not understand what appellant meant.

After James and Chuck got out of the truck, James went into the house and Milton Dickerson (one of the tenants, who was "like an uncle" to Jayda) came to sit next to her in the passenger side of the truck. Jayda "started to pull out drinks" and poured one each for herself, Chuck, and Milton. A couple of minutes later, Chuck followed James into the house to look for cigarettes, and appellant joined the "social atmosphere near the truck."

Appellant stood outside the truck by the passenger side door, and "started to elaborate [to Jayda] . . . about the [upsetting] situation . . . going on between him and his [wife]." Shortly thereafter, Chuck returned, stood "directly behind [appellant], and said 'excuse me'" because, according to Jayda's testimony, "the cigarettes were on the dashboard inside of the truck." This irritated appellant, who

started yelling, "[D]on't you see me fucking talking?  You better get the fuck back. You rude ass [racial epithet]."

Chuck abandoned his attempt to get the cigarettes and walked away, saying, "Man, whatever."  This reaction seemed to aggravate Shepherd, who, "[en]raged and upset," continued to yell at Chuck, saying things like, "you don't know who the fuck I am."  Eventually, Chuck started to get upset when he "felt like his manhood was being tested[,]" and he started "saying things back" to appellant.  At some point during the heated argument, Jayda tried explaining to appellant that Chuck was her cousin, but appellant said, "I don't give a fuck who he is."  Both Jayda and Milton got out of the truck and unsuccessfully attempted to calm the situation.

After James came down from the house to defuse the situation, appellant agreed to leave.  James went back to the house and Jayda, Milton, and Chuck walked back to the truck.  Appellant got in his truck, closed the door, and appeared to be about to leave, but, after less than "60 seconds," he got out of the truck saying, "Jayda, fix me a drink.  I'm about to get a drink and then I'm leaving."  At this point, Jayda had her drink, had given Chuck his drink, and responded to appellant, "You need to calm down.  We all family."  Appellant said, "Yeah, you

right. We all family." But once appellant was within arm's reach, he said, "But family can get their fucking head blown off." Then he "pulled out a gun and shot Chuck right in his mouth."

Appellant then put the gun in his waistband, walked back to his truck, and drove away, eventually leading the police on a prolonged high-speed chase which ended when he crashed into a metal gate at Gallaudet University. The pursuing officers took appellant into custody and found a revolver on the floorboard of the driver's side of the truck. Once in the back of the officers' scout car, appellant said, "What the fuck you looking at? I'm in trouble."

In support of his claim of self-defense, appellant testified that, after their exchange of words, Chuck "attempted to pull a pistol" on him and that, during the ensuing struggle for the gun, "it went off." Two eyewitnesses in addition to Jayda testified to the contrary. Milton testified that he saw the gun in appellant's hand when appellant "raised his hand . . . [at] arm[']s distance" from Chuck. Milton saw the "flash of fire" when appellant shot Chuck in the face. David White, a retired District of Columbia firefighter who lived across the street, testified that, from his window, he "saw the flash" from the gun after appellant "walked up" to Chuck and "fired in his face."

At trial, the government introduced the medical examiner's toxicology report, which indicated that Chuck Miller's blood alcohol content was .19 at the time of his death. Appellant called Emily Jeskie, an expert in the field of "forensic biology and DNA analysis." Jeskie testified that testing the *gun swabs* showed Chuck was a major contributor of DNA and that appellant was a possible contributor, and testing the *cartridge and cartridge casing swabs* showed that Chuck was a possible contributor of DNA but that appellant was excluded as a contributor.

On July 11, 2014, the jury found appellant guilty of first-degree murder while armed and related gun charges, fleeing a law enforcement officer, and destroying property.

## II. Prior Acts of Violence

"[I]n this jurisdiction an accused claiming self-defense in a homicide prosecution may attempt to show that the decedent was the aggressor by showing that the dead person was a bellicose and violent individual." (*William*) *Johnson v. United States*, 452 A.2d 959, 961 (D.C. 1982). For this purpose, "the accused may

present [evidence of] prior acts of violence committed by the victim . . . even if unknown to the accused." (*Markus*) *Johnson v. United States*, 960 A.2d 281, 301 (D.C. 2008). "This is an exception to the general rule, which precludes evidence of any prior wrongs to prove that one acted in conformity with earlier conduct on a later occasion . . . ." *Harris v. United States*, 618 A.2d 140, 144 (D.C. 1992).

We recognize this exception because, when "a controversy arises whether the deceased was the aggressor, one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the probabilities of the deceased's action," *Evans v. United States*, 277 F.2d 354, 356 (D.C. Cir. 1960) (quoting the 1940 edition of Wigmore), and may, in turn, "buttress a claim of self-defense." 1A John Henry Wigmore, *Evidence in Trials at Common Law* § 63 at 1366 (Tillers rev. 1983). "[T]he question is what the deceased probably did," *United States v. Burks*, 470 F.2d 432, 435 n.4 (D.C. Cir. 1972) (citation omitted), and, as Wigmore explained, while a particular instance of the victim's "violent or quarrelsome conduct" does not prove the victim committed an act of aggression, it "does increase the probability of the [defendant's self-defense] story where there is . . . other evidence suggestive of such an act [of aggression]." 1A Wigmore at 1366-67, 1382.

There are important countervailing considerations, however, and a defendant does not have an absolute right to introduce such evidence. Even if proof of prior acts of violence is arguably relevant and admissible, the trial court "is entrusted with broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury" and "may exclude the proffered evidence if its probative value is outweighed by the danger of undue prejudice." *Hawkins v. United States*, 461 A.2d 1025, 1033 (D.C. 1983) (citation omitted). This balancing test may prove particularly difficult because, "[o]f the three methods of proving character[,] . . . evidence of specific instances of conduct is the most convincing." Fed. R. Evid. 405, advisory committee note to 1972 proposed rules. "At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." *Id.*

This court has evaluated the following factors when balancing the probative value and prejudicial impact of first aggressor evidence: the form of proof (accusations or convictions), whether presenting it would waste trial time or confuse the issues, remoteness in time, the decedent's character in the interim, and the "type" of violence evidenced by the prior act. *See, e.g.*, *Evans v. United States*, 277 F.2d 354, 356 (D.C. Cir. 1960) (evidence showing "that the deceased was aggressive when drunk" should have been admitted because it would be "highly

relevant in helping the jury to determine" the truthfulness of the defendant's testimony that the deceased assaulted her, as he was drunk the night she stabbed him); *Hawkins*, 461 A.2d at 1033 (trial judge did not abuse his discretion by excluding first aggressor evidence that, among other things, was too remote in time, was followed by decedent's "apparently peaceable" behavior in the interim, and occurred in dissimilar circumstances); (*Markus*) *Johnson*, 960 A.2d at 302 (holding the prior incident was "too remote in time and different in type").

In this case, appellant wished to present evidence related to three prior events which resulted in criminal convictions of the decedent: (1) a 2010 misdemeanor assault involving domestic violence, (2) a 2010 unarmed purse snatching which resulted in a conviction for attempted robbery, and (3) possession of unregistered firearms in 2002. The court excluded the 2002 conviction, finding that it was "too remote" and did not "show aggression." However, when balancing the "legitimate needs for the defense to show that [the decedent] has [committed] specific acts of violence," the court permitted the "fact of the [robbery] and [domestic violence assault] convictions" without "getting into the facts of either of those instances." Appellant does not challenge the court's decision with respect to the attempted robbery or the 2002 conviction. He argues, rather, that it was an

abuse of discretion to exclude the details of the domestic violence misdemeanor, as summarized in the paragraph-long *Gerstein* statement.[1]

Appellant presented sufficient evidence to raise a claim of self-defense (through his testimony and the DNA evidence, which could be interpreted to corroborate his testimony). Thus, the question of whether appellant may have been the aggressor was before the jury, and the *Gerstein* statement was arguably admissible. Additionally, the circumstances were similar in one respect—Miller was intoxicated on both occasions. The *Gerstein* statement described Miller, while highly intoxicated, breaking into his ex-girlfriend's house, tearing off her clothes, "repeatedly slamming her head against the wall[,]" "spitting in her face[,]" and striking her in the head with a towel rod in front of her children – acts which certainly indicate that Miller had a "violent" or "bellicose" nature.

---

[1] A *Gerstein* statement is a sworn statement by a law enforcement officer "used by prosecutors to establish probable cause at the defendant's initial appearance before the court following his arrest." *Littlejohn v. United States*, 705 A.2d 1077, 1080 (D.C. 1997) (citing *Gerstein v. Pugh*, 420 U.S. 103, 120, 124 n.25 (1975)). Appellant argues this statement should have been admitted both as first-aggressor evidence and to rebut Jayda Ingram's testimony that Miller was a "peaceful" person. As to the latter, the trial court's admission of Miller's convictions for simple assault and attempted robbery was enough to counter Jayda's testimony about Miller's peaceful character.

Even so, it was proper for the trial court to consider that the circumstances were quite different. The prior acts occurred within the context of domestic violence, and the conduct at trial supposedly involved pulling a gun on someone he had just met. *See Hawkins*, 461 A.2d at 1033 (holding appellant's prior act of violence less probative because it occurred within the "special context of the marital relationship"); (*Markus*) *Johnson*, 960 A.2d at 302 (prior act of violence was "different in type, as it involved a heterosexual romantic relationship," not "an alleged homosexual advance with no prior romantic involvement").

Cases such as *Hawkins* and (*Markus*) *Johnson* do not automatically exclude prior acts of domestic violence from being admitted as first-aggressor evidence. *See Evans*, 227 F.2d at 356 (admitting testimony from wife of deceased that her husband would act "belligerent and in a really bellicose type of manner," at least with her, when drinking). However, they illustrate the sound principle that prior acts of violence have more probative value when they are similar in kind to the events on trial. *See Thompson v. United States*, 546 A.2d 414, 418-19 (D.C. 1988) ("Evidence of other crimes may be relevant on purely logical grounds—an armed robber is, other things being equal, statistically more likely than a law-abiding citizen to commit a second *similar* crime." (emphasis added)); H. Richard Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the*

*Courtroom*, 130 U. Pa. L. Rev. 845, 847-48 (1982) ("[O]ur pooled experience leads us to expect repetitions of characteristic conduct," and we thus "look[] forward from an established event . . . to predict the likely *repetition* of its occurrence." (emphasis added)). In this case, Miller's prior actions while intoxicated were unlike those that Shepherd ascribed to him during trial.

Moreover, there was at most a tenuous link between this proffered first-aggressor evidence and the point in contention here. Appellant's claim of self-defense turned on a single question: who brought the gun to the confrontation. As the *Gerstein* statement sheds little light, if any, on the threshold question of who brought the gun to the scene, its probative value was minimal and easily outweighed by the danger of unfair prejudice. The inflammatory details of Miller's past actions were more likely to confuse the jury and "invite a disposition based upon [a] good guy/bad guy comparison rather than the validity of the self-defense defense," *Hawkins*, 461 A.2d at 1033 n.13 (Record citation omitted), which depended entirely on whether Miller pulled the gun on appellant.

The trial court understood that the jury might misuse the "powerful" details of Miller abusing his ex-girlfriend to infer that Miller was a "bad guy." This strong (and not necessarily incorrect) inference about Miller's character raises the

likelihood that the jury would improperly jump to the illogical conclusion that Miller had a gun and pulled it on Shepherd, when, in fact, Miller's abusive conduct fails to illuminate the question of gun possession. Recognizing the strong potential for these details to interfere with the jury's ability to impartially evaluate the merits of the case, the trial court permitted the jury to learn the fact of Miller's misdemeanor conviction without admitting the accompanying details.

"The concept of 'exercise of discretion' is a review-restraining one." (*James*) *Johnson v. United States*, 398 A.2d 354, 362 (D.C. 1979). Given the limited probative value of the first-aggressor evidence and the likelihood that it would confuse or prejudice the jury, the trial court did not erroneously exercise its discretion by excluding the *Gerstein* statement and admitting instead Miller's conviction for simple assault. Even if there were imperfections in the trial court's exercise of discretion, appellant suffered no significant prejudice. His fate was properly determined by the jury's assessment of the credibility of the eyewitnesses (appellant included) and the other powerful evidence of guilt described elsewhere in this opinion. Because reversal is not required, the trial court did not abuse its discretion. *See* (*James*) *Johnson*, 398 A.2d at 367.[2]

---

[2] "[T]he appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether

(continued…)

## III. Mischaracterizations on Rebuttal

Appellant claims that the trial court abused its discretion when, in response to the prosecutor's misstatements during rebuttal, "[t]he only curative step the Court took was to repeat the standard instruction that it is the jury's recollection of the evidence that controls." The principles governing our review of such claims are "well-settled." *Finch v. United States*, 867 A.2d 222, 225 (D.C. 2005). We first determine "whether the challenged comments were, in fact, improper[,]" and if they were, "we must [then] determine whether the trial judge erred or abused his discretion in responding to them." *Id.* This analysis "takes into consideration the context in which the comments were made, the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action taken by the judge, and the strength of the government's case." *Id.* at 226. "Improper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or

---

(…continued)
the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court 'abused' its discretion." *Id.*

clarify what the prosecutor has said." *Coreas v. United States*, 565 A.2d 594, 605 (D.C. 1989) (citations omitted).[3]

When making our assessment, we remember that "[t]he courtroom atmosphere, prior remarks which have provoked the questioned statements, and other factors which cannot be appraised by a reviewing court, may render remarks of counsel innocuous, although they may appear viciously prejudicial when removed from their setting." *Irick v. United States*, 565 A.2d 26, 32 (D.C. 1989) (citation omitted). We also "bear in mind that the trial court has latitude in regulating closing argument, and we do not lightly overturn its discretionary rulings." *Clayborne v. United States*, 751 A.2d 960, 968 (D.C. 2000).

The prosecutor made three primary misstatements on rebuttal. First, she said that "Emily Jeskie, the defendant's DNA examiner, told you that the . . . DNA that was on those *cartridges* was more consistent with bodily fluid" (emphasis added). Ms. Jeskie's testimony actually suggested (but did not directly assert) that swabs of *the gun* contained levels of Miller's DNA that were "more likely to come from a

---

[3] Because appellant made timely objections, we "may not affirm the convictions unless we are satisfied that the appellant did not suffer 'substantial prejudice' from the prosecutor's improper comments." *Finch*, 867 A.2d at 226 (citing the test for harmless error under *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

bodily fluid." The prosecutor also incorrectly stated (mockingly) that appellant said he had "two hands on that tiny little barrel of the gun" even though appellant described placing his hands not merely on the barrel but on top of Miller's hand and under the barrel to "block . . . the back of the gun." Finally, the prosecutor asserted that appellant said, "I always *carry something* with me" when, in fact, government witness William Smith (a tenant of the Chicago Street house) testified that appellant said "I *keep it* with me" (emphasis added).

The trial court acknowledged that the evidence "wasn't quoted precisely" in the government's rebuttal. However, it concluded that, "in the real world of this trial and what was said and how it was said, and the tone it was said, I didn't perceive it to be *such* a mischaracterization of the record to warrant any further remedy" (emphasis added). We note in addition that the remarks were embedded in a lengthy rebuttal spanning twenty-two pages of the transcript. The trial court "'was in a [better] position to evaluate' the impact of the prosecutor's objectionable comments and the likely efficacy of a curative instruction, and we 'attach considerable significance' to its assessment." *Trotter v. United States*, 121 A.3d 40, 54 (D.C. 2015).

Despite the prosecutor's misstatements, the themes of her rebuttal argument were entirely proper, were based on reasonable inferences, and were independently supported by other evidence in the record. Those central points were: (1) the presence of Miller's DNA on the handgun and cartridges did not indicate that he was the one who brought the pistol to the scene, but rather resulted from appellant shooting Miller in the face at close range; (2) appellant's testimony that he acted in self-defense was not credible; and (3) appellant brought to the Chicago Street house the gun that he always kept with him.

In the context of discussing "Government's Exhibit Number 60," which reported on the testing of a portion of the *gun* swabs, the defense's DNA expert, Ms. Jeskie, noted that in *those* swabs, there was "a lot more" DNA from Miller than Shepherd; thus Miller would be considered the "major" contributor. The prosecutor then asked whether "the level of DNA from the major profile . . . [is] more consistent with bodily fluids or places with a high concentration of DNA," to which she responded, "it is more likely to come from a bodily fluid if it's a high amount of DNA." Ms. Jeskie agreed with the prosecutor that the sources of Miller's DNA on the gun were "possibly" his skin cells, saliva, blood, or bone fragment (examples of "back spatter"), which would have been ejected from the gunshot entrance wound.

We agree with appellant's complaint that the portion of Ms. Jeskie's testimony referenced by the prosecutor was *not* directed to the DNA on the cartridges. Nevertheless, Ms. Jeskie did agree with the proposition that "the DNA on [the] cartridges left there by Henry Miller . . . [could] *equally* be consistent with being left over by [back spatter]" (emphasis added). Thus, while it was incorrect for the prosecutor to say that the DNA on the cartridges was "more likely" to come from bodily fluid, the witness did agree that "back spatter" could explain why Miller's DNA was on the cartridges.

The prosecutor also erred in recalling that appellant had claimed to have both hands on the barrel of the gun, but the jury had listened to and watched appellant's entire testimony, during which he clarified the exact placement of his hands during the struggle and demonstrated what had occurred. The jurors also asked to look at the gun, which would have helped them evaluate appellant's claim of self-defense. *See Clayborne*, 751 A.2d at 970 ("[J]urors do not accept uncritically everything a prosecutor says in argument" and "it lies within the sound discretion of the judge to stay his hand and leave it to the jury to 'detect[] prosecutorial non sequiturs.'" (citation omitted)).

Additionally, the prosecutor emphasized, there were many other reasons for doubting appellant's credibility, such as his long list of prior convictions and his insistence that he was not "tired, or mad, or upset, or annoyed" at any point before the shooting. It was also "convenient" that appellant could remember "every single hand movement . . . [and] gesture" before the shooting and during the struggle for the gun, but professed an inability to remember the events following the shooting (including his lengthy reckless flight from the police).

Although the trial court commented that "any reasonable person" would understand that "I always carry *something* with me" meant appellant was "carrying a weapon," it is not at all clear that the jurors would have been familiar with the meaning of this "street jargon" even if many prosecutors, trial judges, and defense attorneys would be. While using the term "carry something" *may* have more quickly led the jury to the conclusion that the "something" was a gun, the jury could readily draw the same conclusion from the actual testimony. Given the full context – that appellant uttered "I keep it with me" after he said "I should kill her" (referring to his wife), but before the shooting – the jury could equally infer that the mysterious "it" appellant kept with him was the handgun he wielded shortly after going to his truck, a weapon he still possessed when arrested in that vehicle.

Before closing arguments, the trial court cautioned the jury that "[t]he statements and the arguments of counsel during their opening and closing arguments are not evidence." Immediately before the jury's deliberations, the court reiterated those principles as a remedial measure, stating that the attorneys' "statements and arguments . . . are not evidence"; the evidence is "what you remember the evidence . . . to be"; and "your recollection . . . controls, not the attorneys['] arguments to you." "The jury is presumed, unless the contrary appears, to follow the instructions, and we find nothing in the record to suggest the jury did not do so." *Sherrod v. United States*, 478 A.2d 644, 659 (D.C. 1984) (citation omitted).

Finally, the evidence of appellant's guilt was very strong. Not only were there three eyewitnesses who saw the events immediately before and after the murder, but appellant was known to two of the eyewitnesses and the other was a disinterested person. Furthermore, the jury could reasonably infer consciousness of guilt from appellant's desperate flight from the police through the District and his subsequent statement to the officers after being placed under arrest, "What the fuck you looking at? I'm in trouble." As the trial judge stated, "from my viewpoint the government more than prove[d] its case . . . and [appellant's]

testimony, quite frankly, was one of the most incredible lines of testimony I've ever heard."

We recognize that "closing arguments are seldom carefully constructed *in toto* in advance, and improvisation often brings about imperfect syntax and planning." *Dixon v. United States*, 565 A.2d 72, 79 (D.C. 1989). Perhaps the prosecutor's misstatements were the result of such improvisation. However, it is vital for a prosecutor to choose her words carefully, as misstatements, "whether [made] deliberately or through negligence," needlessly jeopardize convictions and give rise to the "significant risk . . . that the trial will go for naught." *Lee v. United States*, 668 A.2d 822, 832 (D.C. 1995). Nevertheless, considering the misstatements in context, the trial court's remedial instruction, and the strength of the government's case assures us that the trial court did not abuse its discretion.

## IV. Conclusion

The judgment of the Superior Court is hereby affirmed.