**Markus JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 05–CF–1000.**

District of Columbia Court of Appeals.

Argued March 19, 2008.

Decided Nov. 13, 2008.

Sandra Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Mary B. McCord, David J. Gorman, Roy L. Austin, and Gregory G. Marshall, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and FERREN, Senior Judge.

WASHINGTON, Chief Judge:

On March 17, 2002, Markus Johnson, an aspiring model, killed Michael Myers, the owner of a modeling agency, by inflicting numerous wounds with, among other implements, two knives, a screwdriver, a floor buffer, and finally, a hacksaw. That Johnson committed the act is uncontested. And by all accounts, the scene of the killing was horrific.

A grand jury indicted Johnson for first-degree premeditated murder while armed with aggravating circumstances (that "the murder was especially heinous, atrocious,

or cruel"),[1] first-degree felony murder while armed (while attempting to perpetrate robbery),[2] and armed robbery.[3] At trial, Johnson argued that he killed Myers in self-defense. Johnson claimed that after Myers pressured him about posing for nude photographs, Myers approached Johnson from behind while Johnson was dressing and pressed his groin up against Johnson's buttocks. This led to a struggle that culminated in Myers's violent death. Johnson portrayed his actions as defensive reactions to Myers's unrelenting attacks. The jury disagreed and found Johnson guilty of first-degree premeditated murder.[4]

On appeal, Johnson asserts that the trial court erred in making three evidentiary rulings. First, Johnson claims that the court should have allowed him to testify that at the time of the murder, he was consumed with thoughts about how his step-grandfather had raped Johnson's mother with Johnson's conception being the product of that rape. Second, Johnson contends that the trial court should have allowed him to call a witness who would have testified that Myers sexually assaulted her several years before the killing. Third, Johnson argues that the court erred in denying him the right to explore a government witness's most recent employment. We affirm.

## I.

### *The Government's Evidence*

Michael Myers owned Washington Models, Inc., ("WMI") a small modeling studio located in an apartment at 1133 13th Street, N.W., in Washington, D.C. WMI provided portfolio photography services and advertising for aspiring models. For $75.00, WMI would schedule a photo shoot with Myers or another photographer and then produce a composite card with the model's pictures that the model could use to seek work. For an additional amount, WMI would post the model's pictures online.

In early 2001, Markus Johnson applied to WMI and paid for a composite card. Later that year, Johnson paid to have his pictures posted on WMI's website. Two of WMI's former employees, Duane Hanlon and Crystal Wells, testified about their interactions with Johnson between early 2001 and March of 2002. Hanlon saw Johnson four to five times in person and spoke with him on the phone several times as well. Meanwhile, Crystal Wells—a woman whom Myers met while scouting for models, but whom he later had a romantic relationship with and had named vice president of WMI—testified that she met Johnson in either January or February of 2002. During their first encounter, Johnson arrived at WMI without an appointment and asked to see either Myers or Hanlon. He looked "agitated" and was "bug-eyed" and clutched his shirt and pants while looking around erratically. This scared Wells, who testified that she "felt like he wanted to do harm to [her]." She claimed that she "felt like [her] life was in danger." When Wells told Johnson that neither Hanlon nor Myers were there, Johnson informed her that Hanlon had

---

1. In violation of D.C.Code §§ 22–2101, –4502, and –2104.1(b)(4) (2001).

2. In violation of D.C.Code §§ 22–2101, –4502, and –2104.1(b)(4) (2001).

3. In violation of D.C.Code §§ 22–2801, –4502 (2001).

4. The jury, however, did not find that Johnson committed the murder under aggravating circumstances. It further acquitted Johnson of felony murder while armed and armed robbery, but found him guilty of a lesser included charge of second-degree murder while armed.

called him about a modeling job offer from "Sean John," a popular fashion label, but that no one had called him back with further information. Wells, however, had not heard of any association between WMI and Sean John.[5] Nonetheless, Wells sought to keep Johnson, a client, happy, so she told him that she would set up a new photo shoot for him.[6]

Sometime later, Johnson again arrived at WMI without an appointment, asking Wells to make copies of his composite card. While Johnson waited, Myers arrived and began to argue with Wells: Myers was upset because he did not want Wells to leave early to go see her boyfriend. Wells eventually left. Shortly thereafter Johnson approached Wells across the street from the apartment and asked about the argument. Wells explained that Myers was "overprotective." Johnson then began criticizing Myers's management of WMI. Upon learning that Wells had a fifty percent interest in WMI, Johnson suggested that she try to gain control over it. Wells agreed that Myers was not running the agency well. She then offered to print more composite cards for Johnson, but said that she would change the listed phone number from WMI's to Johnson's cell phone, so that he would not have to bother with WMI anymore.

On March 12, 2002, Wells moved to Los Angeles. Three days later, Johnson called her to complain that although he had scheduled a photo shoot with Myers, he had repeatedly visited or called WMI and no one had gotten in touch with him. Wells suggested that Johnson keep trying;

Johnson responded that he would, but added that "if nothing was done, he would have to go there and handle it." Wells knew that Johnson was upset: his tone was serious. She told him to calm down and try to contact Myers again. She also told him that she intended to return to D.C.

The day after Johnson's conversation with Wells, he left three messages for Myers with Jung–Ah Park, who had started working at WMI after Wells left. Park did not work on the following day, Sunday, March 17, 2002. She did not believe that Johnson was scheduled for a photo shoot on that day.

On the 17th, Myers spoke to his older brother Robert on the phone from about 5:30 until 6:00 p.m. Myers was working at WMI that evening and at times seemed distracted. At 6:00 p.m., he spoke to Hanlon on the phone; he sounded normal. The two of them had planned to meet at WMI at 7:30 p.m. and then go recruit models at Platinum night club. But when Hanlon showed up at 7:15 p.m., no one at WMI answered to buzz him into the building. A resident later let him in and another resident let him up to the third floor. No one answered the door at WMI. Shortly after returning to the lobby to wait, Hanlon saw Johnson come out of the apartment stairwell, holding an electronic box and a nylon bag. Johnson looked anxious and tired. Johnson told Hanlon that he was very tired and then exited the front door.[7] Hanlon then saw Myers's car pull into a parking lot across the street, wait, turn around, and leave. Five min-

---

5.  Hanlon denied telling Johnson about a Sean John job.

6.  This photo shoot never occurred. Lacking the proper equipment to take indoor shots, the photographer suggested shooting outdoors; Johnson declined.

7.  Curious about Johnson coming out of the stairs, Hanlon investigated and discovered that someone had propped open the stairwell fire door. He recalled that sometimes residents did this so that they would not have to take the elevator down to greet guests.

utes later, he saw the car pass the building again. Hanlon eventually left, as Myers never showed up. The next day, Park arrived at WMI and found the front door unlocked, the apartment disheveled, the walls in the waiting room covered with blood, and Myers's dead body on the floor, wrapped in plastic.

Other than Myers and Johnson, no one witnessed what happened in that apartment. But forensic evidence revealed a violent killing. Police reporting to the scene discovered no signs of forced entry.[8] Inside the apartment's kitchen, located next to the front door, cabinets and drawers appeared rifled. The kitchen contained, among other things, tools such as hammers and screwdrivers.[9] Shoe prints on the kitchen floor matched the pattern of a pair of shoes bearing Myers's blood later recovered from Johnson's apartment. Police also discovered a bloodied towel and two bloodied latex gloves on the kitchen counter. The blood on the outside of the gloves was Myers's; the inside of one contained both Myers's and Johnson's blood.

Inside the apartment's office, the police recovered a computer file, dated March 17, 2002, 5:11 p.m., featuring thirty-eight digital photographs of Johnson. In the hallway connecting the office with the agency's waiting room, police discovered a pegboard featuring explicit, nude photographs of Crystal Wells and a hacksaw with Myers's flesh caught in its teeth.

The waiting room door appeared to have been forced open. Shoeprints, again matching shoes recovered from Johnson's apartment, appeared on the exterior of the door; the door's interior featured different shoe prints. The waiting room itself was in disarray. The remnants of a bookshelf, a television set, a screwdriver, a radio, papers, a tripod, and a computer were among the items littered across the floor, many of them bearing Myers's blood. Police also recovered an unbroken but empty vodka bottle, glass from a broken bottle, and a bloodied floor buffing machine. Myers, wrapped in thick plastic, lay on the floor.

According to the medical examiner, Myers died from "multiple injuries, including blunt impact[s] and stab wound[s] to [the] head and neck with strangulation." Myers suffered blunt impact trauma, bruises, lacerations, abrasions, cuts, and stab wounds. Included in these were several stab wounds and cuts to the face made by knives and a three-to-four inch deep stab wound to Myers's right eye. That stab fractured his orbital bone; it appeared to have been made by a screwdriver. In all, Myers suffered nine blunt impact traumas to the head, fracturing his skull in three places, along with internal neck injuries consistent with strangulation.[10] Myers's neck also bore a three and a half inch long gaping wound; his jugular vein and carotid arteries were severed. According to the medical examiner, Myers would have died shortly after suffering the neck wound.[11] His body also featured further cuts, abrasions, and a two and a half inch deep stab wound to the back. His hands bore defensive wounds.

Aside from the extensive forensic evidence tying Johnson to the scene (and

---

8. The front door was unlocked, but the door's interior thumb-latch deadbolt lock still functioned.

9. Park and Hanlon confirmed that the kitchen contained plastic tarps, a box of latex gloves, and assorted tools, including screwdrivers, wrenches, hammers, and a hacksaw.

10. Though there was no external sign of manual strangulation.

11. The medical examiner opined that Myers was alive while receiving the injuries.

Hanlon's testimony about seeing Johnson leave the building), Johnson's girlfriend Jacqueline Ross testified that Johnson admitted the killing to her. Ross knew Johnson was going to WMI the night of the 17th to pick up a suit. She next saw him at 9:30 p.m. and noticed that he had two band-aids on one of his hands; he claimed that he cut his hand on glass in a parking lot. Later that night, Johnson drove Ross to a liquor store in a red car that she had not seen before. Two days later, Ross saw the killing reported on television. The news featured Myers's missing red car, which matched the one Johnson had been driving. After Ross confronted Johnson, he told her that he had gotten into a fight with Myers, claiming that Myers had tried to enter the room when Johnson was changing and that Myers had been "acting gay." According to Johnson, Myers hit him with a bottle, they got into a fight, and then Myers hit him with a board. But Johnson knocked Myers to the ground, went to the kitchen, got a knife, and cut Myers's throat. According to Ross, when Johnson later discovered that the police had interviewed her, he proposed marriage so that they would not have to testify against each other.

After police arrested Johnson, they recovered from his apartment multiple items taken from WMI, including two digital cameras, a DVD player, compact disks, and Myers's wallet, along with clothing and shoes with Myers's blood on them. With Johnson's direction, they recovered two knives, one missing the tip of its blade, from woods near Johnson's apartment. Myers's car turned up in a parking lot near Johnson's apartment. The police found the car keys shoved into the back-seat of the vehicle used to drive Johnson to the police station.

### The Defense Evidence

Johnson testified that he killed Myers in self-defense. Johnson first discussed his background with WMI. He had gone to WMI with hopes of becoming a model. Myers photographed Johnson on two or three occasions, and WMI provided Johnson with a composite card. Johnson later paid to have his pictures posted online. Yet he never earned money by modeling for WMI. Although he told the police after his arrest that he had modeled for Sean John and Perry Ellis, he conceded at trial that this was untrue.

Johnson testified that he and Myers had a good relationship and that he would regularly accompany Myers on model recruitment calls. At clubs, he noted, Myers would usually go up to the top floor where there was homosexual activity; Johnson "didn't feel that [this] was a threat to [him] in any kind of way." He also claimed to have driven to and from New York City with Myers for a photo shoot for Sean John, but the photographer had not shown up. According to Johnson, during the trip Myers asked him if he would pose nude for a male calendar shoot. Johnson initially refused, but after Myers told him how much it paid, he said he would consider it.

Johnson also confirmed certain details about his interactions with Crystal Wells: he saw her a few times at WMI; she printed composite cards for him; he was present when she fought with Myers. He also acknowledged that he called Wells on her cell phone while she was in LA. But he denied telling her that he was upset with Myers or that he told her that he would go to WMI and "take care of it."

On March 17, 2002, Johnson's aunt drove him to WMI to retrieve a suit; he did not expect Myers to be there. Myers buzzed Johnson into the building and descended in the elevator to greet him and to take him up. Myers then asked Johnson if

he wanted to do a photo shoot. Johnson said that his aunt was waiting, so Myers told him to invite her up. But Johnson's aunt, upon being told about the shoot, said she was too tired to wait and left. Johnson remained. He was happy about the shoot. Back in the WMI apartment, Johnson changed into his suit and watched a DVD in the waiting room while Myers talked on the phone. Myers then took approximately thirty photographs of Johnson.[12] When the shoot ended, Johnson mentioned that Crystal Wells was going to return to D.C. and had offered to prepare a new composite card. Myers became upset when hearing about Wells. He then retrieved nude photographs of Wells and handed them to Johnson. Myers took another phone call, while Johnson took the pictures and went to change in the waiting room.

Johnson waited in the room for twenty to thirty minutes, but did not entirely change his clothing during that time. Myers then came into the room to show Johnson the pictures of Johnson they had just taken. After praising the pictures, Myers then told Johnson that he wanted to take nude pictures of Johnson—"like Crystal's." Johnson refused and turned his back to continue getting dressed. But Myers continued to pressure him, saying that Johnson had promised to do so. Johnson responded that he had said only that he would consider it.

Johnson kept dressing. But as he was putting on his socks and shoes, Myers approached him from behind and "rested his crotch up against [Johnson's] buttocks." When asked what went through his mind, Johnson testified, "I thought he was coming onto me, trying to rape me or something."[13] He thought this "[b]ecause [Myers] had his private parts on [Johnson's] private part." Johnson tried to leave, but Myers had locked the door. Myers tried to grab his wrist to prevent him from leaving, but Johnson deflected and then yanked at the locked door until it popped open. Just then, Myers tried to hit Johnson in the head with an empty vodka bottle; Johnson managed to block it with his hand. He claimed that the bottle caused the cuts on his hand, though the bottle did not break. Having never seen Myers act like this, Johnson was scared. He and Myers grabbed each other, wrestled, and then fell into a book shelf. Myers seized one of the shelves and swatted Johnson on the thigh. Johnson testified, "[o]nce Mike hit me with the board, the only thing I could think of now was try to get Mike, try to get him before he could get me." He did not know if Myers was "trying to kill [him] or rape [him]."

After wrestling again for a few minutes, Johnson broke free and ran out of the room. But instead of exiting the front door, Johnson went to the kitchen-adjacent to the door-and found a knife. He explained that he could not get out of the front door without a key, so he armed himself and returned to retrieve the key and the rest of his things. Returning, Johnson faced Myers, who though unarmed, lunged at him. Johnson defended himself by stabbing Myers in the back of the head until the blade broke. Myers kept fighting. So Johnson grabbed a screwdriver and stabbed Myers in the eye. But Myers kept fighting, pulling the screwdriver out of his own eye and mus-

12. At trial, Johnson claimed that he had been shirtless in some of the pictures, but the photographs later recovered by the police revealed no shirtless pictures.

13. As discussed at length below, Johnson claimed that he also thought about his step-grandfather's rape of his mother. The court's exclusion of this testimony is the subject of the first issue on appeal.

cling it from Johnson's hand. So Johnson grabbed a hacksaw and hit Myers with it. Still, Myers kept fighting. Johnson conceded, that at some point, he hit Myers with a floor buffer. So Johnson swung the hacksaw at Myers's neck, slitting his throat and causing Myers's death.

Afterwards Johnson sat to collect his thoughts. He tried to clean himself up in the kitchen and then put on latex gloves so that he would not leave any fingerprints.[14] He rolled Myers's body in plastic. He then pinned the nude Crystal Wells photos on the pegboard, along with the hacksaw, because he wanted the police to be aware that Wells might be in danger. He left the apartment, and after running into Duane Hanlon in the lobby, he took Myers's car to get home as fast as he could.

After his arrest, Johnson denied knowing anything about the pictures posted on the pegboard, but when confronted with evidence connecting him to them, he told the police that Myers had agreed to pay him $10,000 to help kill Wells. He conceded at trial that this was untrue. Johnson also explained to the jury that he took the DVD player, digital cameras, and other items because he wanted to remove items that he had touched. Yet he left behind the screwdriver, the hacksaw, and other items that he knew he had used.

## II.

Johnson asserts that the trial court deprived him of his constitutional right to present a complete defense by precluding him from testifying that when Myers pressed up against him from behind, he thought about his somewhat recent discovery that the person who he had long thought to be his step-grandfather was actually his biological father and that

Johnson had been the product of a rape. At trial, Johnson claimed that these thoughts were relevant to show his subjective fear of what was going on. Although the court permitted Johnson to testify about Myers's act in pressing up against him and that Johnson feared that Myers was going to rape or kill him, it excluded the testimony about the mother's rape as irrelevant and unfairly prejudicial. We review to determine whether the court deprived Johnson of his right to present a complete defense, and if not, whether the court abused its discretion in excluding the evidence. But first we examine Johnson's trial proffer in more detail.

### A.

During opening statements, Johnson's counsel began to allude to Johnson's discovery of his mother's rape (and his discovery that he was the product of that rape):

> [Y]ou will hear that around the time of his graduation from high school, [Johnson] had learned that the man he believed was his step-grandfather....

In response to the government's objection on relevance and unfair prejudice grounds, Johnson's counsel stated that the evidence was relevant because "[i]t goes to [Johnson's] frame of mind." At the bench conference, counsel sought to explain the relevance to the court:

> Counsel: The proffer is, Your Honor, that his mother—he learned that the man he thought was his step-grandfather was, in fact, his biological father—essentially, was with his mother.
>
> Court: What's the relevance of that?
>
> Counsel: And the relevance to it is that the situation, as he will testify,

---

14. On cross-examination, Johnson conceded that he told the police that he had already put the gloves on before using the hacksaw on Myers.

had made him feel like this man he trusted, this grandfather, had sexually assaulted his mother. And that—

Court: I'm sustaining the objection. Let's proceed. It's not relevant. Let's proceed.

Days later, near the end of the government's case, the government moved to preclude the defense from eliciting any evidence of Johnson's mother's rape during Johnson's direct testimony. Defense counsel proffered:

The first proffer is that I expect that my client will testify that during the time, or at the time that Mr. Myers, I believe, came upon his person and put his pubic area on his person—there has been argument that the court has heard about my client believing that [Myers] was making some sexual advance toward [Johnson] and that [Myers] was trying to rape him. Obviously, some jurors might think that is an over-reaction, just that part alone.

My client had learned, just about a year or so prior to this, about basically how he was conceived; in essence, that his mother was raped, molested, whatever you want to call it. He had just learned about that about a year or so prior. At the time that Mr. Myers made what my client . . . thought was a sexual advance, the thoughts of what occurred with his mother went through his head, and it went to his own subjective fear. Even though it might not be objective, depending on what the jury feels about that, it went to his subjective fear about what was going on, because he, the [ ] testimony will come out, had a relationship with Michael Myers that was beyond just going to take a photo shoot at the W.M.I.

We will establish that they had been together on numerous occasions, and he

had what he thought was a trusting relationship with Michael Myers, which is similar to the relationship his mother had with the stepfather, or whatever he was.

In response, the court stated that it

concur[red] with the government that the proffer is more prejudicial than probative. All it does in my mind is try to attempt to engender sympathy for the defendant. He is free to talk about his fear of bodily injury, but not what happened to his mother being impregnated by her father.

Although defense counsel attempted to continue—"He does not know the details necessarily of what happened with his mother. He will testify . . ."—the court informed him that it had "already ruled on it."

Though precluded from testifying about his alleged thoughts about his mother's rape, Johnson testified that while he was putting on his socks and shoes in the apartment's waiting room, Myers walked up behind him and "rested his crotch up against [Johnson's] buttocks." When asked what went through his mind, Johnson replied, "I thought he was coming onto me, trying to rape me or something." And when asked why he believed that, Johnson answered, "because he had his private parts on my private part." Johnson went on to testify that though he tried to leave the room, he discovered that Myers had locked the door and that Myers would not allow him to leave. The struggle then ensued.

Subsequently, in closing argument, Johnson's counsel placed the alleged sexual advance at the heart of the self-defense claim. After explaining that Johnson believed that Myers was bisexual, Johnson's counsel described Johnson's perception of Myers's alleged sexual advance in context:

So when [Myers] came up on [Johnson], he thought, "this might [be] some kind of sexual advance, because he has wanted me to take nude pictures. He has shown me some very explicit photographs of Crystal [Wells]. And now he has his private parts on me as I turn my back on him."

Well, what does he do? What did Mr. Johnson tell you he did? He doesn't start beating up on Michael Myers. He does [what] anybody would try to do. "I am trying to get out of this room."

Johnson's counsel proceeded to explain Johnson's actions as reactions to Myers's attacks. And in the end, he returned to the same self-defense theory: "He did what he had to do. He did what he had to do. Put yourself in his position. He acted in self-defense, and the government has not rebutted that. The government has not proven that he did not—he did not act in self-defense."

### B.

■ Johnson argues that by denying him the right to testify about his thoughts of his mother's rape, the court deprived him of his constitutional right to present a complete defense. We do not think the court's limitation reached the level of constitutional deprivation.

■ The Constitution guarantees defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (internal quotation omitted). Of course, "an essential component of procedural fairness is an opportunity to be heard." *Id.* To ensure this opportunity, the Supreme Court has made clear that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock v. Arkansas,* 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d

37 (1987). For example, in *Rock v. Arkansas,* the Court held that Arkansas' per se rule barring a defendant from offering post-hypnosis testimony as inherently unreliable violated his constitutional right to present a complete defense. *See* 483 U.S. at 61–62, 107 S.Ct. 2704. Similarly, a trial court may not wholly prevent a defendant from offering evidence of third-party perpetration. *See, e.g., Holmes v. South Carolina,* 547 U.S. 319, 329–31, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (reversing South Carolina's application of a rule that considered only the strength of the government's evidence in determining whether to admit the defendant's third-party perpetrator evidence). Nor may it require a higher threshold of relevance for such evidence to be admissible. *See, e.g., Winfield v. United States,* 676 A.2d 1, 4–5 (D.C.1996) (en banc).

■ But while the Constitution prohibits the exclusion of defense evidence based on arbitrary rules, trial courts retain discretion to weigh the probative value of evidence against its prejudicial weight: "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes, supra,* 547 U.S. at 326, 126 S.Ct. 1727 (citing, *inter alia,* FED. R.EVID. 403). The trial court must be able to retain this type of trial-management authority. As we explained in *Winfield,* though trial courts may not impose a heightened relevancy standard to the admissibility of third-party perpetrator evidence, they retain discretion to weigh the probative value of that evidence against its prejudicial potential: "In the context of third-party perpetrator evidence, this means the trial judge will have discretion to exclude marginally relevant evidence creating the danger that proof of prior

dealings or hostility between the victim and the third persons will distract the jury from the issue in this case." 676 A.2d at 5. "The judge must retain full authority to prevent this sort of trial-within-a-trial." *Id.*

Johnson correctly asserts that evidence of his state of mind is relevant in a first-degree murder trial. As such, the trial court could not apply an arbitrary rule to preclude him from offering such evidence. But contrary to Johnson's assertion, the trial court did not wholly preclude him from testifying about his state of mind: Johnson was permitted to, and did, testify that when Myers pressed up against him, he believed that Myers was trying to rape him, adding later that he did not know if Myers was trying to rape him or kill him. Further, he explained that he feared rape because Myers pressed up against him. And this testimony came in following testimony that Johnson perceived Myers to be bisexual; that Myers had shown Johnson nude photographs of Crystal Wells; and that Myers had pressured Johnson about posing nude as well.

Rather, the court exercised discretion in limiting his testimony after balancing the proffered evidence's probative value against its prejudicial potential. By applying standard evidentiary rules to the evidence rather than an arbitrary rule, and by limiting rather than excluding the evidence, the court did not constitutionally deprive Johnson of his right to present a complete defense. Thus, our task is to determine whether the trial court abused its discretion in its evidentiary analysis.

### C.

We review a trial court's evidentiary decisions for abuse of discretion,

and in doing so, broadly defer to the trial court due to its "familiarity with the details of the case and its greater experience in evidentiary matters." *Sprint/United Mgmt. Co. v. Mendelsohn,* —— U.S. ——, ——–——, 128 S.Ct. 1140, 1144–45, 170 L.Ed.2d 1 (2008); *see also (James) Johnson v. United States,* 398 A.2d 354, 362 (D.C.1979) (explaining that appellate courts defer to trial courts because of their "superior opportunity to get the feel of the case") (internal quotation omitted). This principle therefore applies where a trial court considers the relevance and potential prejudice of evidence: " 'Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the [trial court's] sound judgment under Rules 401 and 403....' " *Sprint/United Mgmt. Co., supra,* 128 S.Ct. at 1145 (quoting *United States v. Abel,* 469 U.S. 45, 54, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)). As emphasized by the Court, "[t]his is particularly true with respect to Rule 403 since it requires an 'on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.' " *Id.* (quoting 1 S. CHILDRESS & M. DAVIS, FEDERAL STANDARDS OF REVIEW § 4.02, p. 4–16 (3d ed.1999)).[15]

We must further recognize that trial courts make these evidentiary decisions within the heat of trial, and therefore, we must be mindful of context. "With respect to evidentiary questions in general and Rule 403 in particular, a [trial court] virtually always is in the better position to assess the admissibility of the

---

**15.** Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

evidence in the context of the particular case before it." *Id.* at 1146. Thus, "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight." *Old Chief v. United States,* 519 U.S. 172, 182 n. 6, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

But while we broadly defer to the trial court's evidentiary decisions, we must still ensure that the court actually exercised its discretion and that it did so deliberately rather than arbitrarily. We have previously outlined a five-part analytical model for reviewing a trial court's decision for abuse of discretion. *See Johnson, supra,* 398 A.2d at 363–67. First, we ask whether the decision at issue was committed to the trial court's discretion. *Id.* at 363. Second, we look to see whether the trial court recognized that it had discretion and whether it purported to exercise it. *Id.* Third, we examine the record to see whether it "reveal[s] sufficient facts upon which the trial court's determination was based." *Id.* at 364. For this factor, we noted that "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." *Id.* Fourth, we must determine whether the trial court exercised discretion erroneously. *Id.* at 365. To do so, we must determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Id.* (internal quotation omitted). But in doing so, we must be mindful that trial judges often have to make these decisions during trial where they are "confronted with situations that do not admit the amassing of a record and the enumeration of reasons upon which a structured review must depend." *Id.* For this reason, we should consider the "nature of the de-

termination being made and the context within which it was rendered," and thus, if necessary, we "may examine the record and infer the reasoning upon which the trial court made its determination." *Id.* at 365–66. Finally, if we find error, we must consider whether it was harmless. *See id.* at 366. We turn now to consider the trial court's exclusion of Johnson's proffered testimony.

### D.

Near the close of the government's case, it moved *in limine* to prevent Johnson from testifying about his mother's rape, arguing that it was irrelevant and that it would be prejudicial to the government because it would "simply [be] a matter providing sympathy to the defendant." As set forth in full above, Johnson's counsel replied that there had been argument at trial that Myers made a sexual advance to Johnson and that the proffered testimony was relevant "to [Johnson's] subjective fear about what was going on." Johnson's counsel also informed the court that he sought to compare the violation of Johnson's trusting relationship with his grandfather to Myers's violation of Johnson's trusting relationship with Myers. The trial court, however,

> concur[red] with the government that the proffer is more prejudicial than probative. All it does in my mind is try to attempt to engender sympathy for the defendant. He is free to talk about his fear of bodily injury, but not what happened to his mother being impregnated by her father.

Thus, the trial court found that the proffered testimony had minimal, if any, probative value, and that it was wholly outweighed by the possibility that the government would be prejudiced by sympathetic testimony. In reviewing whether this determination was a proper

exercise of discretion, we are guided by the principles set forth above.

First, having concluded that the trial court's limitation of Johnson's testimony did not unconstitutionally deprive him of the opportunity to testify about his state of mind, *see supra* Part II.B, we can further conclude that the decision about whether to admit this evidence was committed to the trial court's discretion. *See Dockery v. United States,* 853 A.2d 687, 697 (D.C. 2004) (reiterating that decisions regarding evidentiary admissibility are committed to the trial court's discretion); *Smith v. United States,* 686 A.2d 537, 542 (D.C.1996) (confirming that the trial court has "broad discretion to determine the substance, form, and quantum of evidence which is presented to a jury") (internal quotation omitted). Second, the trial court recognized that it had this discretion, and further, it purported to use it. By agreeing that the proffer was "more prejudicial than probative," the trial court invoked the rubric of Rule 403 which, of course, confers discretion on the trial court. *See* 2 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 403.02[1][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2008) ("[Rule 403] is the major rule explicitly recognizing the broad discretionary power of the judge in controlling the introduction of evidence."). And by concurring that the prejudicial potential outweighed the probative value, the court demonstrated its exercise of that discretion.

▮ Third, we must determine whether the trial court based its determination on a firm factual record: "Just as a trial court's action is an abuse of discretion if no valid reason is given or can be discerned for it, so also it is an abuse of discretion if the stated reasons do not rest upon a specific factual predicate." *Johnson, supra,* 398 A.2d at 364 (internal cita-

tion omitted). This factor, like the following one as well, requires us to consider context:

> The test of the record underlying the exercise of a trial court's discretion tends to vary somewhat with the nature of the issue to be decided. Generally the factual record must be capable of supporting the determination reached by the trial court. The facts may foreclose one or more of the options otherwise available to the trial court.

*Id.* Here, the trial court's determination reveals two essential findings: (1) that the court found the proffered evidence to be of minimal probative value, and (2) that all it did was engender sympathy for the defendant. The context of the proffer helps elucidate the factual underpinnings of these findings. It is crucial to note that Johnson claimed self-defense at trial. Meanwhile, the government had already put on evidence of the brutality of the killing, thus strongly suggesting that excessive force was used as a matter of law. Yet when asked to explain the proffered testimony's relevance, Johnson's counsel tied it directly to Johnson's interpretation of Myers's pressing up against him as a prelude to rape, and thus, attempted to tie the evidence to the self-defense claim. Counsel conceded that the jury might find it objectively unreasonable that Johnson would construe such an act as rape, but that Johnson's thoughts of his mother's rape would help demonstrate Johnson's "subjective fear about what was going on." Further, counsel wanted to compare Johnson's relationship with his grandfather to his relationship with Myers, ostensibly to highlight to the jury the extreme violation of sexual assault.

▮ Thus, when the defense made the proffer, the court evaluated whether evidence that he thought about his mother being raped before his birth was relevant

or probative to his self-defense claim in light of the evidence before it. Viewed in this light, it is difficult to see the probative value of Johnson's testimony. Nothing about Johnson's subjective beliefs could have perfected his self-defense claim, as it did nothing to mitigate the excessive force used as measured by an objective standard. *Accord, Edwards v. United States,* 721 A.2d 938, 941–42 (D.C.1998) (affirming the trial court's decision not to grant defendant a self-defense jury instruction where he had used excessive force in shooting an unarmed person). And while evidence of subjective beliefs is relevant to a self-defense claim, the defense proffer here did not establish how the thoughts of Johnson's mother's rape would lead him to honestly, though mistakenly, believe that he had to use the amount of excessive force that he did. *Cf. Fersner v. United States,* 482 A.2d 387, 393 (D.C.1984) (concluding as a matter of law that appellant could not have, even in the heat of passion, had reasonable grounds to believe that his infliction of repeated hatchet blows to an aggressor was necessary to defend the victim of the aggressor's attacks). Rather, the court seemed far more assured that testimony about Johnson's personal anguish at learning about his mother's rape, his grandfather's betrayal, and his own conception would create sympathy for Johnson. Because the court viewed the evidence as tangential and irrelevant, it found this possible creation of sympathy unfair. Given the evidence adduced by the government, along with Johnson's failure to draw a more direct connection between thoughts of his mother's rape and his own honestly held belief that either he faced imminent death or severe bodily harm or that he had to use the amount of force that he did, we cannot say that the trial court's decision is unsupported by the record.

Fourth, in examining whether the trial court erroneously exercised its discretion, we consider whether the court's action was within a range of permissible alternatives. *See Johnson, supra,* 398 A.2d at 365. In this regard, we note that while the trial court here found the testimony about thoughts of his mother's rape to be irrelevant, it did not further preclude him from testifying about his state of mind or the objective reasons supporting that state of mind: the court precluded the testimony about the mother's rape, but it permitted Johnson to testify that he feared that Myers was going to rape him based on Myers's actions. Johnson testified to that effect; he told the jury that he was afraid that Myers was going to rape him because Myers had his private parts on Johnson's private parts. And Johnson further supported that testimony by testifying that he perceived Myers to be bisexual, that Myers had shown Johnson nude pictures of Wells, and that Myers pressured Johnson about posing nude. This balance by the trial court demonstrates that it recognized a range of possible rulings, and that it attempted to permit Johnson to explain his state of mind, while it wanted to preclude what it viewed as tangential testimony.

Under this fourth factor, we must also determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Johnson, supra,* 398 A.2d at 365 (internal quotation omitted). On appeal, Johnson has made a stronger argument for relevance and admissibility than that made at trial: instead of helping explain why Johnson interpreted Myers's act as a prelude to rape, his argument on appeal portrays the thoughts in his head as creating an intense and consuming (perhaps irrational) fear of rape. And particularly by Johnson's reply brief and his oral argument, he directed his argument more

towards a heat-of-passion, frenzied emotional killing than the measured, reactive self-defense killing argued at trial. For example, within his reply brief, Johnson honed in on the testimony's implications for second-degree murder:

The government fails to appreciate that it was the savage and frenzied nature of Mr. Myers' death that made understanding Markus Johnson's state of mind so critical to the jury's determination of his fate. This Court has long recognized that one who kills in the heat of passion caused by fear, anger or rage, or in an orgy of frenzied violence, commits a second degree murder, not a first degree murder.

Johnson Reply Br. at 8.[16] Johnson's reply brief expanded on the possible effect of his excluded testimony:

Had Johnson been permitted to testify that his mind filled with thoughts of his mother's rape, he may have raised a reasonable doubt in the jury whether he killed Myers after "reflect[ing] upon the preconceived design to kill[,] turning it over in the mind, giving it second thought." [*Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979)]. The jury may have believed, instead, that his perception of Myers' intentions, understood through the veil of his thoughts of his mother's rape, provoked impulsive frenzy, or heat of passion fueled by fear, anger or rage.

Johnson Reply Br. at 11 (brackets in original). Similarly, at oral argument, Johnson's counsel openly described the scene as a "bloody disarray," and the killing as a "horrific killing." But according to Johnson's counsel, his testimony about his thoughts of his mother's rape would help the jury make sense of the brutality:

The evidence would have supported the jury's conclusion, number one, that there was not premeditation and deliberation; instead, if his mind was overwhelmed with these thoughts of his mother's rape, if he had an emotional response that he was, that he killed in the heat of passion. That that the crime scene showed evidence of that kind of frenzy. That the jury would have ... could have acquitted of first-degree murder because of what it thought about the power of those emotions.

This strikes a different argument than the rational escalation of attack and defensive reaction posited at trial. Johnson's trial theory—including the rationale for why the excluded evidence was relevant—revolved around a self-defense theory. As he testified and as his counsel argued, he believed that Myers was going to rape him, so he tried to leave; Myers attacked him, so he defended himself; he got free and walked through the apartment and past the front door, but had to arm himself with a knife so that he could return to the waiting room to get a key to exit the building; and finally, Myers continued to attack him (despite Johnson's infliction of numerous injuries with various implements), so he continued to defend himself. His trial argument therefore cast his actions as rational and measured, though gradually escalating, reactions.

16. Johnson relies heavily on *Austin v. United States*, 127 U.S.App. D.C. 180, 382 F.2d 129 (1967), wherein the United States Court of Appeals for the District of Columbia Circuit concluded that evidence of a savage murder was insufficient to establish premeditation and deliberation. In this case, however, even Johnson admitted that he got away from Myers, walked past the front door to the kitchen, searched for and selected a knife, and returned to the waiting room. Though he claims Myers lunged at him, he concedes that Myers was unarmed. Given his ability to leave, his selection of a knife, and his return to face Myers, there was sufficient evidence to find premeditation and deliberation.

In modifying the argument on appeal to one focused on the excluded evidence's potential relevance to a frenzied state of mind, Johnson implicitly suggests that the trial court failed to consider the testimony's relevance to a distinction between first and second degree murder. To be sure, his enunciated theory could correspond to feelings of fear, terror, or rage at Myers's actions. But this ignores the context of the proffer at the time it was made: neither Johnson nor his counsel appear to have ever argued at trial that he was consumed in a frenzied rage while killing Myers. That is, rather than a hot-blooded, heat-of-passion argument, Johnson advanced a more rational, measured self-defense argument—which the jury rejected. Indeed, Johnson's closing argument forcefully returned to the same self-defense theory developed throughout the defense portion of the trial: "He did what he had to do. He did what he had to do. Put yourself in his position. He acted in self-defense, and the government has not rebutted that. The government has not proven that he did not-he did not act in self-defense."

This is not to say that Johnson's self-defense claim foreclosed an argument that the proffered evidence was relevant to distinguish first-degree murder from second-degree or manslaughter. Indeed, in *Howard v. United States*, we reversed an assault with intent to murder while armed ("AWIMWA") conviction against a defendant who claimed self-defense because the trial court had precluded him from presenting evidence of prior encounters with the decedent that was relevant not to self-defense, but to provocation. *See* 656 A.2d 1106, 1117–19 (D.C.1995). That is, the evidence related to malice and thus to the distinction between AWIMWA and assault with intent to kill while armed. But unlike this case, in *Howard,* the defense specifically informed the trial court that the proffered testimony was relevant to provocation, stating, *"[e]ven if there is no self-defense, these things are relevant to mitigation for provocation and those are still relevant issues." Id.* at 1116 (emphasis in original). Johnson's counsel made no such proffer, nor did it otherwise direct the court to the relevance now asserted on appeal.[17]

We do not believe that the trial court erroneously exercised its discretion in this case and on these facts.[18] The trial

---

**17.** In *Martin v. United States*, we concluded that a defendant had apprised the trial court of the meritorious legal theory for suppressing evidence—albeit barely—before the court and the parties shifted focus to a different theory, and thus, that the trial court erred in failing to suppress the evidence on the first ground argued. *See* 952 A.2d 181 (2008). By contrast, here, Johnson never argued that he had killed while in a frenzied state. Nor did his counsel otherwise apprise the court of the excluded evidence's relevance to a heat-of-passion argument.

**18.** In his concurring opinion, our colleague, Judge Ferren, takes exception to our consideration of the excessiveness of the force used by appellant when assessing whether the trial court erred when it refused to admit appellant's proffered testimony that he felt threatened by Myers because he had recently become aware that his mother had been raped by his step-grandfather. He correctly points out that the trial court never specifically mentions the excessiveness of the force used by appellant as a basis for its ruling and posits that our conclusion that the trial court did not err is flawed because our analysis improperly conflates the trial court test for admissibility with our review for harmless error. We disagree. The only point we are making here is that a trial court must always consider the extent to which a party may be prejudiced by the admission of any evidence and that a reviewing court's perspective should always be informed by how the issue is presented to the trial court.

Here, appellant contends that he was acting in self defense when he beat and mutilated

court recognized its discretion and purported to exercise it. In doing so, the court attempted to balance Johnson's right to explain his state of mind and the reasons supporting that state of mind against the potential for the seemingly irrelevant testimony about his mother's rape to appeal unfairly to the jury's sympathies. By permitting Johnson to testify that he feared rape based on Myers's actions, and to supplement that with testimony insinuating that Myers was bisexual, that he had photographed Crystal Wells in the nude, and that he tried to pressure Johnson into taking nude photos, the court permitted Johnson to testify both to his state of mind (that he feared rape) and evidence to support the reasonableness of that state of mind (the context of Myers's acts within Johnson's knowledge of Myers's sexual proclivities). See Smith, supra, 686 A.2d at 542–43 (concluding that the trial court did not abuse its discretion in limiting Smith's testimony about his prior encounters with the decedent despite its relevance to his self-defense claim because the trial court had admitted evidence of that type). Given the substantial deference that we owe the trial court and given the context of the proffer, we cannot say that the exclusion of the additional and at that time seemingly irrelevant testimony about the mother's rape was an abuse of discretion.

## III.

■ Johnson next alleges that the trial court erred in preventing one of his proposed witnesses from testifying. The witness was prepared to testify that Myers had sexually assaulted her—though Johnson had no knowledge of that assault on the day of the killing. We review the trial court's evidentiary rulings for abuse of discretion, see Washington v. United States, 884 A.2d 1080, 1095 (D.C.2005), and hold that there was no abuse of discretion in declining to allow this witness to testify.

In 1994, several years before Myers's killing, he had begun a romantic relationship with a woman in Virginia known as Ms. R. She reported to the police that about two weeks into the relationship, and after the couple had already been sexually intimate, Myers began to act aggressively toward her in his apartment. The police report stated that Myers threw Ms. R. across his bed and held her down while kissing her on the neck and fondling her breast. She pleaded with Myers to stop, but he did not. He pulled down her pants and, over her objections, digitally penetrated her vagina. She asked Myers if he was going to rape her; he responded, "No, I'm going to make love to you." She believed that he stopped his assault because of her resistance and her crying.

Myers's version to the police, however, described Ms. R. as a willing participant. He reported that the two were first kissing in his living room before Ms. R. agreed to follow him to his bedroom. While engaging in more kissing inside his bedroom, he unzipped her pants. At that point, she asked if he was going to rape her. But according to Myers, he stopped upon hearing that question. He did not report any crying or resistance by Ms. R., and denied

---

Myers. Given this defense, we find it very unlikely that in weighing the probative value of the proffered evidence against its prejudicial impact, the trial court completely ignored the excessiveness of the force used by appellant, since excessive force can negate a claim of self-defense. See Dorsey v. United States, 935 A.2d 288, 293 (D.C.2007). Moreover,

appellant never argued to the court that he sought to introduce the evidence as part of any claim for mitigation under an imperfect self defense theory or to support any other defense theory. Therefore, despite our colleague's criticism, we are unpersuaded that the trial court erred in declining to admit this evidence.

digitally penetrating her. After this, she did not indicate that there was a problem. And by all accounts, he took her to the grocery store when the two left the apartment shortly after the incident. Upon being charged, Myers took an *Alford* plea,[19] but claimed that he did so because he could not afford the mounting legal bills.

Johnson proposed to call Ms. R. as a witness to testify consistent with her 1994 allegations because he believed that this testimony would shed light on who was the first aggressor in this case. The trial court precluded Ms. R. from testifying because the incident was too remote in time and too different from the incident between Myers and Johnson.

■ The trial court has "broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Smith, supra,* 686 A.2d at 542 (internal quotation omitted). There is no question that the accused may present prior acts of violence committed by the victim and known to the accused to support a self-defense claim, as "such evidence is relevant to the reasonableness of the accused's fear of the victim." *Harris v. United States,* 618 A.2d 140, 143 (D.C. 1992). But in homicide cases, an accused may also present evidence of a victim's prior acts of violence even if unknown to the accused to show that the victim was the first aggressor. *See United States v. Akers,* 374 A.2d 874, 877 (D.C.1977); *Harris, supra,* 618 A.2d at 144. That said, "[e]ven if satisfied that the evidence is relevant and admissible under applicable evidentiary rules, the trial court must still determine whether the probative value of the evidence outweighs any unduly prejudicial effect when weighed against competing interests." *Harris, supra,* 618 A.2d at 143.

In *Hawkins v. United States,* this court held that the trial court did not abuse its discretion in refusing to admit proffered prior acts of violence testimony. *See* 461 A.2d 1025, 1033–34 (D.C.1983). In that case, Hawkins had been charged with second degree murder while armed after killing a motorist during a traffic dispute. Hawkins proffered that three years before the murder, the decedent had assaulted the decedent's wife and that the decedent had purposefully inflicted injury upon himself when his wife threatened to leave him. *Id.* at 1033. This court, in affirming the trial court's decision, reasoned that the "proffered evidence had scant probative value because it was remote in time, because of the decedent's apparently peaceable character in the interim three years, and because the proffered evidence concerned instances of the decedent's violent behavior in the special context of the marital relationship." *Id.* (footnote omitted). This court further observed that the evidence had the potential to confuse the issues and unduly prejudice the jury. *Id.*

As in *Hawkins,* the trial court in this case did not abuse its discretion in refusing to admit the proffered testimony of Myers's previous sexual assault because that incident had little probative value. The incident here, having occurred seven years before the killing, was indeed remote in time. And there is no evidence of any violent behavior by Myers in the interim time period. Although the alleged incident falls under the broad category of sexual aggression by Myers, the potential for confusion and prejudice was great, especially considering that Myers was not available to tell the jury his account of the events of that evening in 1994. Further, Myers claimed that he took an *Alford* plea, which does not involve an admission to the facts underlying the plea, *see Jones v. United*

---

19. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

*States,* 401 A.2d 473, 475 n. 1 (D.C.1979), because he could not afford to continue paying legal fees, thus arguably diminishing the reliability of his culpability in that incident. Further, the 1994 incident was different in type, as it involved a heterosexual romantic relationship. The incident involving Johnson was an alleged homosexual advance with no prior romantic involvement between Myers and Johnson. Although we recognize Johnson's right to present evidence of the victim's past violent behavior even when he had no knowledge of the behavior, the trial court was still obligated to weigh the probative value of this evidence against its potential for prejudice. Having done so, the trial court did not abuse its discretion in determining that the testimony proffered by Johnson was far too remote in time and different in type to allow the witness to testify.

## IV.

■ Finally, Johnson contends that the trial court's refusal to allow cross-examination of Crystal Wells's last place of employment denied him his Sixth Amendment right of confrontation. While we agree that the trial court's preemption of this line of questioning was erroneous, we hold that the error was harmless.

On direct examination, the government elicited from Wells that she had attended a prestigious D.C. high school and that she had finished two years of college and had majored in aerospace engineering. She also testified that she was an operations analyst prior to becoming full-time at WMI. But she also admitted on direct that she had dropped out of college due to a drug addiction; that at the time of trial she was fighting a heroin addiction; and that the government had assisted her in enrolling in a drug treatment program right before trial.

At the onset of cross-examination, the following colloquy transpired between defense counsel and Wells:

Defense Counsel: Ms. Wells, I believe on direct examination you stated that you currently live in LA, correct?

Ms. Wells: Yes.

Defense Counsel: And before you flew back to D.C. recently, were you employed in LA?

Ms. Wells: No.

Defense Counsel: Are you familiar with a person by the name of Jesse Chase?

Ms. Wells: Yes.

Defense Counsel: And who is Jesse Chase?

Ms. Wells: He's my ex-boyfriend.

Defense Counsel: And he was your boyfriend while you were out in LA?

Ms. Wells: Yes.

Defense Counsel: Are you familiar with an establishment called—

At this point, the government objected and a bench conference ensued. The following exchange occurred at the bench:

Government: I believe counsel is going into irrelevant information, which—

Trial Court: What were you intending to proffer?

Defense Counsel: What she used to do before she—what she used to do at her last place of employment.

Trial Court: What is the relevance of that?

Defense Counsel: Because the Government has put her into a drug program and cleaned her up. That's not how she is. And the jury needs to get a full picture of who she is.

Trial Court: What is your proffer about her last place of employment?

Government: She worked at a body shop. And this was a male, I guess, a gentleman's place.

Trial Court: Objection is sustained. Please have a seat.

■ Johnson argues that this exclusion was erroneous. Indeed, the Confrontation Clause of the Sixth Amendment guarantees a defendant the right to cross-examine prosecution witnesses. *See Coles v. United States,* 808 A.2d 485, 489 (D.C. 2002). This right, however, is not without limits. *See id.* "Restriction on cross-examination may be imposed within reasonable limits to avoid such problems as harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant ... [or] where the prejudicial effect of the proffered evidence outweighs its probative value." *Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001) (internal quotations omitted). In determining whether the trial court abused its discretion in imposing limits on cross-examination, we consider whether the appellant was denied meaningful cross-examination. *See Crutchfield v. United States,* 779 A.2d 307, 316 (D.C.2001).

The Supreme Court has held that the right of cross-examination includes the right to inquire as to the witness's place of residence because it allows counsel "to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." *See Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *see also Smith v. Illinois,* 390 U.S. 129, 131–32, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). Although *Alford* and *Smith* do not involve cross-examination on a place of employment, courts applying these cases have made no distinction between a witness's

address and place of employment. *See United States v. Navarro,* 737 F.2d 625, 633 n. 9 (7th Cir.1984) (citing *United States v. LaBarbera,* 463 F.2d 988 (7th Cir.1972); *United States v. Palermo,* 410 F.2d 468 (7th Cir.1969)); *see also United States v. Ott,* 489 F.2d 872, 876–77 (11th Cir.1973); *Caldwell v. Minnesota,* 536 F.2d 272, 273 (8th Cir.1976); *People v. Thurman,* 787 P.2d 646, 654 (Colo.1990).

In this case, the trial court sustained the government's objection that the proffered testimony was irrelevant despite the government's eliciting of extensive testimony about Well's employment before her alleged employment at the "gentleman's place." Because information as to a witness's place of employment assists the jury in fairly appraising the witness and deciding what weight to give her testimony, and because there was no claim of harassment, unfair prejudice, witness safety, or confusion of the issues, the trial court erred in precluding this witness from testifying about her possible employment at the gentlemen's place.[20]

■ We next consider whether this error warrants reversal. When the trial court's error wholly deprives a defendant of any opportunity to cross-examine a witness on a central issue, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt. *See Clark v. United States,* 639 A.2d 76, 81 (D.C.1993) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). However, "[i]f the issue is merely collateral, or where ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights, and we

20. Further, because the trial court curbed defense counsel's questioning, the jury and this court are unable to assess whether the witness testified truthfully in answering that she was unemployed prior to flying back to D.C. However, even assuming that she was being untruthful, the error is still harmless.

apply the less stringent test for harmless error set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)." [21] *Clark, supra,* 639 A.2d at 82. In this case, we need not decide whether the trial court's curtailment of this line of questioning wholly deprived Johnson the opportunity to cross-examine a witness on a central issue because even under the *Chapman* standard this error does not warrant reversal.

Johnson proffered that the cross-examination about Wells's employment was necessary to show the jury "who she is," that is, to undermine the government's considerable efforts to portray her in the best possible light. Evidence of employment in a gentleman's establishment may have contributed to that goal. But the jury learned substantially more damaging information about Wells, namely, that she had dropped out of school due to a drug addiction, that she was still fighting an addiction to heroin at the time of the trial, and that she had only recently enrolled in a drug treatment program with the government's assistance. Further, Johnson was allowed to, and did, explore these areas on cross-examination, along with her posing for nude photographs and her relationship with Myers. Having heard the positive and the negative, the jury had ample opportunity to see who she was. That she also may have worked in a gentleman's establishment was cumulative. Accordingly, we can say beyond a reasonable doubt that the outcome of this trial would not have changed.

## V.

For the foregoing reasons, the decision of the Superior Court is

*Affirmed.*

---

21. Under this standard, the error is considered harmless only if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239.

FERREN, Senior Judge, concurring in the judgment:

As to the first, "mother-was-raped" issue proffered by the defense, I agree that there was no constitutional error. Moreover, as matters turned out, there was no abuse of trial court discretion in keeping that testimony out of the defense case. I write separately, however, to highlight why, in my view, the court erred in exercising its discretion, and why there was no abuse of discretion requiring reversal *only* because the error was harmless. *See (James) Johnson v. United States,* 398 A.2d 354, 366–367 (D.C.1979).

## I.

As defense counsel was beginning his opening statement, the trial court sustained the government's objection to counsel's allusion to the anticipated "mother-was-raped" testimony. The court cut off counsel's explanation as to why that testimony would reflect "frame of mind," ruling that the testimony would not be "relevant." That abrupt ruling, without allowing further elaboration by counsel, was erroneous because frame of mind is relevant to self-defense, *see Howard v. United States,* 663 A.2d 524, 528 n. 6 (D.C.1995), and the court as yet had no basis for concluding that the proffered testimony had no such bearing.

Later, after the government had put Johnson's many brutal acts in evidence, the government was apparently unsure whether the trial court had ruled definitively on the "mother-was-raped" testimony and was concerned that such testimony

might provide traction for the defense if admitted. The government, therefore, filed a motion in limine to bar the testimony. For the first time, defense counsel had an opportunity to elaborate on why that testimony should be admitted. He opposed the government's motion by explaining its relevance to establishing Johnson's "subjective fear," a frame of mind tending to justify self-defense. *See id.* This time, the court rejected the defense argument not because it was irrelevant but because, as the government by then was arguing, the proffered testimony—an "attempt to engender sympathy for the defendant"—would be "more prejudicial than probative."

I suppose we can say that, in moving on to a probative/prejudicial analysis, the trial court implicitly assumed relevance of the proffered testimony, in contrast with its initial finding of irrelevance. Nonetheless, while explicitly referring to possible prejudice (jury sympathy), the court did not discernibly evaluate why testimony attempting to explain fear of rape had relatively little probative value. Apprehension of rape, triggered or intensified by a terrible, highly personal memory, would have added credence to Johnson's assertion of fear; otherwise, that fear could only have been premised—as Johnson was allowed blandly to testify—on Myers' putting "his private parts on my private part." Indeed, the proffered testimony was all the more probative because subjective fear is central to a defendant's right to an "imperfect" self-defense instruction, which the trial court gave in this case, requiring evidence of a defendant's "actual belief both in the presence of danger and the need to resort to force." *Swann v. United States*, 648 A.2d 928, 932 (D.C.1994). I cannot imagine, and the trial court offered no explanation, why Johnson's proffered "mother-was raped" testimony would generate so much jury sympathy for this self-confessed, bru-

tal killer that this testimony would prejudice the government more than it would add probative value to the most plausible explanation Johnson could offer for that brutality.

Viewing the entire record, I cannot be satisfied that the trial court adequately exercised discretion in finding more potential prejudice than probative value. Conceivably the court believed that Johnson's memory of his mother's rape was too attenuated to have probative value, but the court did not say so. To the contrary, especially because the court initially called the testimony "not relevant," and because Johnson had learned about his mother's rape only "about a year or so prior"—not years earlier—I do not believe we can assume that the court relied on attenuation as the basis for its ruling. Nor did the government or the court offer any other rationale. In the decision thirty years ago that governs our review of trial court discretion, we stressed that this court "should inquire *whether the trial court's reasoning is substantial* and supports the trial court's action." *Johnson,* 398 A.2d at 365 (emphasis added). We must determine, more specifically, whether the trial court "failed to consider a relevant factor," whether it "relied upon an improper factor," and whether "the reasons given reasonably support the conclusion." *Id.* (citation and internal quotation marks omitted). We also acknowledged that, "[i]f needs be," we may "examine the record and infer the reasoning upon which the trial court made its determination." *Id.* at 366. But here any such inference would have to go completely outside anything mentioned at trial or inferable from any colloquy between court and counsel. On this record, we cannot be sure what factors the trial court considered, let alone be satisfied that the court employed the "substantial" reasoning required. In short, we cannot tell

why the court concluded that if the "mother-was-raped" testimony were admitted, the prejudice to the government from jury sympathy for Johnson would outweigh the probative value of that testimony in establishing Johnson's fear of Myers. Accordingly, I cannot agree with the majority's conclusion that the trial court did not "erroneously exercise[ ] its discretion in this case." *Ante* at 299.

My colleagues find my error analysis unpersuasive because they perceive an additional factor relevant to—in fact controlling—the trial court's exercise of discretion. That factor is the "excessive force" limitation on self-defense, which Chief Judge Washington incorporates into review of the trial court's discretionary analysis. But, as noted earlier, neither the prosecutor—who had the burden of proof once Johnson claimed self-defense, *see Rorie v. United States*, 882 A.2d 763, 771 (D.C.2005)—nor the trial court ever mentioned excessive force. The majority's approach, therefore, reads into the equation a component of trial court discretion that is not there. If excessive force has a place in our review, it belongs in an evaluation of harmlessness, not trial court error.[1]

## II.

A trial court's exercise of discretion in ruling out evidence based on a probative/prejudicial analysis can survive judicial review, even when the court has erred by failing to provide adequate reasoning, if the record clearly establishes that any error in excluding the evidence was harm-

less. *See Johnson*, 398 A.2d at 366–367. So, was the discretionary error here harmless? More specifically, because of Johnson's many acts of brutality, did the "mother-was-raped" testimony lose its currency for the defense because trial counsel, in seeking to use that testimony to establish fear, did not also relate it to the excessiveness limitation on the use of deadly force in self-defense?

Before addressing that question we must resolve a procedural issue. The government, as noted earlier, did not raise excessive force at trial, and the trial court did not touch it. So is that issue properly before us now? The government has argued excessive force on appeal in response to Johnson's contention on appeal that his "frenzied" mind, attributable to memory of his mother's rape, excused all his brutal actions in killing Myers—a contention the defense did not make at trial. On appeal, therefore, Johnson has not been willing to rest his case on the probative value of his limited rationale proffered at trial, namely, that his memory caused or enhanced his fear. He has pressed us, somewhat differently, to premise our review on an alleged frenzy his "mother-was-raped" memory produced in him, causing not only fear but also wild frenzy. In short, Johnson has enhanced on appeal the argument he offered at trial. All things considered, therefore, I have no problem with our taking up the government's corresponding argument that however real the frenzy may have been, it resulted in excessive force nullifying self-defense. Indeed, even

---

1. In reviewing the exercise of trial court discretion, we have articulated the harmless error component as follows: "[W]e must ask, *having found error, is it of a magnitude to require reversal.*" *Johnson*, 398 A.2d at 366. "[T]he appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court "abused" its discretion." *Id.* at 367. An abuse of discretion, therefore, is not merely an erroneous ruling; it is a harmful erroneous ruling-one that requires reversal.

if Johnson had not elevated "fear" to "frenzy," the government could have argued the excessive force limitation (explained in the jury instructions) to undermine the "mother-was-raped" testimony.

Now to the merits. This court has noted that "the victim's subjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self defense." *Fersner v. United States,* 482 A.2d 387, 391–392 (D.C. 1984). But we also have stressed an important limitation: in determining the degree of force required—even when acting justifiably with deadly force in "the heat of passion"—the victim's perceptions must "be reasonable under the circumstances." *Id.* at 392. There are "degrees of deadly force," *id.,* some reasonable, others unreasonable, on the facts presented. In this case, even though Johnson was entitled to the "perfect" and "imperfect" self-defense instructions he requested and received, it is clear—there can be no doubt—that no reasonable jury, properly instructed as the jury was here, could have found that the degree of force Johnson used in defending himself against Myers was objectively "reasonable." It was excessive as a matter of law. *See id.*

Accordingly, even if—contrary to the trial court—we were to grant Johnson's contention that the proffered testimony was not only relevant but also more probative than prejudicial in showing his subjective fear of Myers, a jury's finding of such fear could not have reasonably led to an acquittal based on the self-defense instructions the jury received. Even if Johnson had been allowed to testify that his brutal acts were attributable to his going berserk because Myers's sexual touching had triggered the unbearable memory of his mother's rape, that testimony—when added to all the other defense evidence admitted at trial—would not have been sufficient to convince a reasonable jury that Johnson's multiple acts of brutality, viewed objectively, were reasonable, not excessive. *See Alcindore v. United States,* 818 A.2d 152, 157 (D.C.2003) (quoting *Fersner,* 482 A.2d at 391–392). Accordingly, because the "mother-was-raped" testimony would have offered little if any help to the defense on the required objective evaluation of excessive force (ultimately the controlling self-defense issue)—and further because the evidence tended strongly to show that Johnson could have escaped from the premises even if Myers was the aggressor threatening serious bodily harm—I agree that the trial court's discretionary error was harmless. In the words of *Johnson,* it was not of a "magnitude requiring reversal." *Id.* at 366.

### III.

My theoretical difference from the approach my colleagues take may seem hypertechnical to some, but in reviewing for abuse of discretion we are tempted too often, I think, to merge error and harmlessness together so that review of alleged error is ignored if harmlessness can be found. The very power of discretion gives the trial court great leeway; we have recognized that when the court has "discretion," it has a range of choice broad enough to be "wrong" up to a point without suffering reversal. *Johnson,* 398 A.2d at 367. Only when that exercise of discretion reaches a magnitude of error beyond that range do we overturn the ruling on appeal. *Id.* In this case, the trial court's error did not reach that level of magnitude, but error there was. And given the broad range of choice that trial court discretion allows, it is important, I think, for all concerned to have error identified when error occurs.